## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| Ameren Services Company, *et al.,* | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 16-1075 |
| Federal Energy Regulatory Commission, | ) | |
| | ) | |
| Respondent. | ) | |

## UNDERLYING DECISIONS FROM WHICH
## THE PETITION ARISES

Pursuant to the Court's February 29, 2016 Order, Ameren Services

Company, with and on behalf of its transmission-owning public utility affiliates

Ameren Illinois Company, Union Electric Company d/b/a Ameren Missouri, and

Ameren Transmission Company of Illinois (together, the "Ameren Companies"),

International Transmission Company d/b/a ITC*Transmission*, ITC Midwest LLC,

and Michigan Electric Transmission Company, LLC (together, the "ITC

Companies") (and collectively with the Ameren Companies, the "Petitioners")

respectfully submit the attached copies of the following underlying decisions from

which the petition arises:

- *Midcontinent Independent System Operator, Inc.,* Docket Nos. ER14-2464-002; EL15-36-000; EL15-68-000, Order Denying Rehearing, Granting in Part and Denying in Part Complaint, and Instituting Section 206 Proceeding, 151 FERC ¶ 61,220 (June 18, 2015).

- *Otter Tail Power Company v. Midcontinent Independent System Operator, Inc.,* Docket Nos. EL15-36-001; EL15-68-000; EL15-68-001, Order Denying Rehearing and Granting Clarification, and Directing Compliance Filing, 153 FERC ¶ 61,352 (December 29, 2015).

Respectfully submitted,

*/s/ Christopher R. Jones*
Christopher R. Jones
TROUTMAN SANDERS LLP
401 9th Street, N.W., Suite 1000
Washington, D.C. 20004
(202) 662-2181
Christopher.Jones@troutmansanders.com

*Counsel for the Petitioners*

Dated this the 29th day of March, 2016

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day electronically filed the forgoing document using the CM/ECF system, which automatically provides email notification of the filing to the attorneys of record in the above captioned docket.

Dated at Washington, D.C., this 29th day of March, 2016.

*/s/ Christopher R. Jones*
Christopher R. Jones
Troutman Sanders LLP

151 FERC ¶ 61,220
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION


Before Commissioners:  Norman C. Bay, Chairman;
                       Philip D. Moeller, Cheryl A. LaFleur,
                       Tony Clark, and Colette D. Honorable.


| | |
|---|---|
| Midcontinent Independent System Operator, Inc. | Docket Nos. ER14-2464-002 |
| Otter Tail Power Company | EL15-36-000 |
| v. | |
| Midcontinent Independent System Operator, Inc. | |
| Midcontinent Independent System Operator, Inc. | EL15-68-000 (not consolidated) |


ORDER DENYING REHEARING, GRANTING IN PART AND DENYING IN PART
COMPLAINT, AND INSTITUTING SECTION 206 PROCEEDING

(Issued June 18, 2015)


1.     On December 12, 2014, in Docket Nos. ER14-2464-000 and ER14-2464-001, the Commission issued an order conditionally accepting an unexecuted non-conforming Facilities Construction Agreement (FCA) among Border Winds Energy, LLC (Border Winds) as interconnection customer; Otter Tail Power Company (Otter Tail) as transmission owner; and Midcontinent Independent System Operator, Inc. (MISO) as transmission provider (Border Winds FCA), subject to the removal of provisions that deviate from MISO's *pro forma* FCA.[1]  On January 12, 2015, in Docket No. ER14-2464-002, MISO and Otter Tail each filed a request for rehearing of the Border Winds FCA Order.  In this order, we deny the requests for rehearing.

---

[1] *Midcontinent Indep. Sys. Operator, Inc.*, 149 FERC ¶ 61,224 (2014) (Border Winds FCA Order).

2.     On January 12, 2015, in Docket No. EL15-36-000, Otter Tail filed a complaint, pursuant to sections 206 and 306 of the Federal Power Act (FPA),[2] alleging that MISO's Open Access Transmission, Energy and Operating Reserve Markets Tariff (Tariff) is unjust and unreasonable to the extent that the *pro forma* FCA contained therein does not permit an affected system operator the same right to elect to provide the initial funding for network upgrades that is given to directly-connected transmission owners under MISO's *pro forma* Generator Interconnection Agreement (GIA).[3]  In this order, we grant in part and deny in part Otter Tail's complaint.  We also find that MISO's *pro forma* GIA may similarly be unjust, unreasonable, unduly discriminatory or preferential because it provides opportunities for undue discrimination and for increasing costs to interconnection customers where there is no increase in service, given that interconnection customers within MISO are held responsible for network upgrade costs and do not receive credits that reimburse them for those costs.  Accordingly, we institute a proceeding to examine MISO's *pro forma* FCA, GIA, and Multi-Party Facilities Construction Agreement (MPFCA) pursuant to section 206 of the FPA in Docket No. EL15-68-000, as discussed more fully below.

## I.     <u>Background</u>

3.     MISO's *pro forma* GIA governs the network upgrades constructed for the interconnection customer by the transmission owner with which it directly interconnects. In October 2009, the Commission accepted MISO's proposal for cost responsibility for network upgrades as set forth in revised Attachment FF of its Tariff.[4] As such, under the existing Tariff, an interconnection customer is responsible for 100 percent of network upgrade costs, with a possible 10 percent reimbursement for projects that are 345 kV and

---

[2] 16 U.S.C. §§ 824e, 825e (2012).

[3] Otter Tail January 12, 2015 Complaint and Request for Fast-Track Processing, Docket No. EL15-36-000, at 1 (filed Jan. 12, 2015) (Otter Tail Complaint).

[4] Attachment FF (Transmission Planning Expansion Protocol) of the MISO Tariff describes the process to be used by MISO to develop the MISO Transmission Expansion Plan, which facilitates the expansion of and/or modification to MISO's transmission system.

20150618-3002 FERC PDF (Unofficial) 06/18/2015

Docket No. ER14-2464-002, *et al.*                                              - 3 -

above.[5]  This is referred to herein as MISO's Interconnection Customer Funding Policy.  At that time, MISO's Tariff provided three alternatives for funding the costs of network upgrades for generator interconnections.  Attachment FF of the Tariff described two of these alternatives (Option 1 and Option 2), which were incorporated into MISO's *pro forma* GIA by reference, while Article 11.3 in MISO's *pro forma* GIA[6] contemplated a third.

4.      Under Option 1:  (1) the interconnection customer provided up-front funding for network upgrades; (2) the transmission owner provided a 100 percent refund of the cost of network upgrades to the interconnection customer upon completion of the network upgrades; and (3) the transmission owner assessed the interconnection customer a monthly network upgrade charge to recover the cost of the non-reimbursable portion of the network upgrade costs over time and based on a formula contained in Attachment GG[7] of the MISO Tariff.  The charge was established through a separate facilities service agreement (FSA).

5.      Under Option 2:  (1) the interconnection customer provides up-front funding for network upgrades and (2) the transmission owner refunds the reimbursable portion of the payment, as applicable, to the interconnection customer in the form of a credit to reduce the transmission service charges incurred by the transmission customer with no further financial obligations on the interconnection customer for the cost of upgrades.

---

[5] *Midwest Indep. Transmission Sys. Operator, Inc.*, 129 FERC ¶ 61,060, at P 8 (2009).  The Commission allows flexibility as to the specifics of interconnection pricing policies for transmission providers that are independent entities, and MISO's proposal was accepted by the Commission as an independent entity variation from the Commission-approved *pro forma* Large Generator Interconnection Agreement (LGIA). *Id.* P 50.

[6] MISO's *pro forma* GIA is located in Appendix 6 to Attachment X of the MISO Tariff (Generator Interconnection Procedures).

[7] Attachment GG (Network Upgrade Charge) of the MISO Tariff includes in the calculation of the network upgrade charge a return on capital investment, income taxes, depreciation expense, operating and maintenance expense (O&M), administrative and general expense, and other direct and indirect costs.

Docket No. ER14-2464-002, *et al.*                                    - 4 -

6.      Under a third alternative set forth in Article 11.3 of MISO's *pro forma* GIA, the transmission owner can unilaterally elect to provide the up-front funding for the capital cost of the network upgrades.[8]  MISO's existing *pro forma* GIA at Article 11.3 reads as follows:

> Transmission Owner shall provide Transmission Provider and Interconnection Customer with written notice pursuant to Article 15 if Transmission Owner elects to fund the capital for the Network Upgrades and Transmission Owner's System Protection Facilities; otherwise, such facilities, if any, shall be solely funded by Interconnection Customer.

The transmission owner could unilaterally elect any of the three options to fund the costs of network upgrades for generator interconnections.

7.      On October 20, 2011, the Commission responded to a complaint filed in March 2011 by ordering the removal of Option 1 from MISO's Attachment FF, finding that this option increased the costs directly assigned to the interconnection customer with no corresponding increase in service compared to other funding options.[9]  The Commission found that it was unjust and unreasonable to require an interconnection customer to provide up-front funding for network upgrades and then permit the transmission owner to

---

[8] This option was originally identified in Order No. 2003.  *See Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, FERC Stats. & Regs. ¶ 31,146, at P 720 (2003) (Order No. 2003), *order on reh'g*, Order No. 2003-A, FERC Stats. & Regs. ¶ 31,160, at PP 618, 658 (Order No. 2003-A), *order on reh'g*, Order No. 2003-B, FERC Stats. & Regs. ¶ 31,171 (2004), *order on reh'g*, Order No. 2003-C, FERC Stats. & Regs. ¶ 31,190 (2005) (Order No. 2003-C), *aff'd sub nom. Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007), *cert. denied*, 552 U.S. 1230 (2008).  The option in the *pro forma* LGIA established by Order No. 2003 differs from the option in MISO's Tariff.  Specifically, under Article 11.3 of the Order No. 2003 *pro forma* LGIA, a transmission owner electing to initially fund network upgrades would provide the up-front funding for the capital cost of the network upgrades, and then recover the costs of the network upgrades through its transmission rates charged to *all* transmission customers.  In contrast, in MISO, a transmission owner electing to initially fund network upgrades would assign the non-reimbursable portion of the costs of the network upgrades directly to the interconnection customer through a network upgrade charge, and would not provide credits to reimburse the interconnection customer for projects under 345 kV.

[9] *E.ON Climate & Renewables North America, LLC v. Midwest Indep. Transmission Sys. Operator, Inc.*, 137 FERC ¶ 61,076, at P 34 (2011) (*E.ON*), *order on reh'g*, 142 FERC ¶ 61,048, at P 34 (2013).

repay the amount and charge the transmission customer for the transmission owner's capital costs and income tax allowance.[10]  The Commission also found that leaving the election of Option 1 to the sole discretion of a transmission owner "creates unacceptable opportunities for undue discrimination by affording a transmission owner the discretion to increase the costs of interconnection service by assigning both increased capital costs, as well as non-capital costs . . . to particular interconnecting generators, but not others."[11] The Commission noted that a third option (described below) was still available under MISO's *pro forma* GIA as an alternative to Option 2.[12]

8.      In 2013, the Commission was presented for the first time with MISO's implementation of the transmission owner's election under Article 11.3 of MISO's *pro forma* GIA to initially fund network upgrades whose costs are directly assigned to the interconnecting customer under MISO's Interconnection Customer Funding Policy.[13]  In *Hoopeston*, the Commission found that it is just and reasonable and not unduly discriminatory for the transmission owner electing to initially fund network upgrades under MISO's *pro forma* GIA to recover the capital costs for network upgrades through a network upgrade charge assessed to the interconnection customer, established using the formula in Attachment GG and consistent with MISO's Interconnection Customer Funding Policy.[14]  However, consistent with its findings in *E.ON*, the Commission found that it is unduly discriminatory for a transmission owner to recover costs other than the return of and on the capital costs of the network upgrades (such as O&M, taxes other than income taxes, and general and common plant costs) from an interconnection customer under this option, because an interconnection customer charged under Option 2 would only be required to pay for the capital costs of the network upgrades.  Therefore, the Commission directed MISO to revise the GIA at issue in that case so that the network upgrade charge does not include the recovery of costs other than the return of and on the capital costs of the network upgrades.[15]

---

[10] *E.ON*, 137 FERC ¶ 61,076 at P 37.

[11] *Id.* P 38.

[12] *Id.* P 37.

[13] *Midcontinent Indep. Sys. Operator, Inc.*, 145 FERC ¶ 61,111 (2013) (*Hoopeston*), *aff'd on reh'g*, 149 FERC ¶ 61,099 (2014).

[14] *Hoopeston*, 145 FERC ¶ 61,111 at P 41.

[15] Thus, in *Hoopeston*, the Commission sought to make the types of costs to be recovered pursuant to Article 11.3, when the transmission owner elects to initially fund the network upgrades, comparable with the costs recovered under Option 2.

9.      In addition to MISO's *pro forma* GIA, the Commission has also accepted MISO's *pro forma* FCA and *pro forma* MPFCA.[16]  The *pro forma* FCA is an agreement for network upgrades on affected systems, or network upgrades constructed for an interconnection customer by a transmission owner other than the transmission owner with which it directly interconnects.  This indirectly-connected transmission owner is known as the affected system operator under the FCA.  The *pro forma* MPFCA is used when multiple interconnection requests cause the need for construction of common network upgrades (upgrades that are constructed by a transmission owner for more than one interconnection customer) on a directly-connected transmission system or the transmission system of an affected system operator.  The *pro forma* FCA and *pro forma* MPFCA are appendices to MISO's generator interconnection procedures and, as with the *pro forma* GIA, these agreements reference MISO's Interconnection Customer Funding Policy and the network upgrade cost recovery provisions in Attachment FF of MISO's Tariff.  However, the *pro forma* FCA and the *pro forma* MPFCA do not include the unilateral initial funding option contained in Article 11.3 of MISO's *pro forma* GIA.

## II.    Border Winds Facilities Construction Agreement Proceeding, Docket No. ER14-2464

### A.    MISO's Filing

10.     On July 18, 2014, as amended on October 14, 2014, MISO, pursuant to section 205 of the FPA,[17] submitted for filing the unexecuted non-conforming Border Winds FCA.  MISO stated that the unexecuted Border Winds FCA generally conformed to the *pro forma* FCA, with the exception of non-conforming language in section 3.2.1 that provided Otter Tail (as the affected system operator) with the option to elect to provide the initial funding for the network upgrades.[18]  MISO argued that the non-conforming language was just and reasonable because an affected system operator under MISO's *pro forma* FCA is similarly situated to a directly-connected transmission owner under MISO's *pro forma* GIA, and the two entities should have the same rights and obligations regarding funding and recovery options for network upgrades.[19]  MISO proposed a mechanism to recover Otter Tail's capital costs for the network upgrades using an annual

---

[16] *Midwest Indep. Transmission Sys. Operator, Inc.*, 129 FERC ¶ 61,301, at P 5 (2009).

[17] 16 U.S.C. § 824d (2012).

[18] MISO Border Winds FCA Filing, Docket No. ER14-2464-000, Transmittal Letter at 2 (filed July 18, 2014) (MISO Border Winds FCA Filing).

[19] *Id.* at 3.

Docket No. ER14-2464-002, *et al.*                                                  - 7 -

fixed charge rate of 15.8 percent, based on Otter Tail's currently effective rates set forth in Attachment GG[20] of MISO's Tariff, to derive a network upgrade charge that would be assessed to the interconnection customer over 20 years pursuant to a separate FSA.[21] The Border Winds FCA was submitted unexecuted because Border Winds disagreed with the addition of the non-conforming language allowing Otter Tail to elect to initially fund network upgrades.

### B.     The Border Winds FCA Order

11.     On December 12, 2014, the Commission conditionally accepted the unexecuted Border Winds FCA, to become effective July 19, 2014, as requested, subject to removal of the non-conforming language that would have provided Otter Tail the unilateral right to elect to initially fund the network upgrades and subsequently assess a network upgrade charge.[22] The Commission noted that a transmission provider seeking Commission acceptance of a non-conforming agreement bears a high burden to justify and explain that the non-conforming aspects of the agreement are not merely consistent with or superior to the *pro forma* provisions of the agreement, but that they are necessary.[23] The Commission found that MISO did not assert any specific reliability concerns, novel legal issues, or other unique factors to justify the proposed non-conforming provisions in the Border Winds FCA, as it found that the initial funding option was an issue that was not novel or unique to the Border Winds interconnection.[24] The Commission therefore directed MISO to revise the Border Winds FCA to conform to MISO's *pro forma* FCA and remove provisions from the appendices to the Border Winds FCA that implemented the initial funding option. The Commission also required MISO to report the executed revised Border Winds FCA in its electric quarterly reports and submit an informational filing to notify the Commission of the agreement's execution.[25]

---

[20] The formula rate in Attachment GG includes in the calculation of the network upgrade charge a return on capital investment, income taxes, and depreciation expense.

[21] MISO Border Winds FCA Filing, Transmittal Letter at 2.

[22] Border Winds FCA Order, 149 FERC ¶ 61,224 at PP 1, 22.

[23] *Id.* P 24.

[24] *Id.* P 25.

[25] *Id.* P 26.

Docket No. ER14-2464-002, *et al.*                                    - 8 -

C.    **Requests for Rehearing**

12.    MISO filed a request for rehearing and clarification of the Border Winds FCA Order in Docket No. ER14-2464-002.  Otter Tail filed a request for rehearing of the Border Winds FCA Order, request for stay and interim relief, and request for expedited action and shortened answer period in Docket No. ER14-2464-002.

13.    MISO states that the Border Winds FCA Order can be interpreted two ways, either that:  (1) the Commission rejected MISO's non-conforming edits as unnecessary, but will permit the initial funding option in the Border Winds FCA because the use of this option is not novel or unique to this particular interconnection (and the Commission would generally permit this option in FCAs); or (2) the Commission rejected the initial funding option.[26]  MISO requests that, if the Border Winds FCA Order did reject the initial funding option, the Commission should clarify whether it is rejecting that option for all FCAs, absent a change to the MISO *pro forma* FCA.[27]  MISO states that, in the past, the Commission has accepted GIAs with non-conforming deviations and directed MISO to include such non-conforming provisions in the *pro forma* GIA so that they are clearly available to all parties on a transparent basis.[28]  MISO claims that the Commission could use the same approach here and accept the proposed non-conforming provisions in this FCA and allow MISO to modify its *pro forma* FCA to ensure that this option is available to all parties on a consistent basis.[29]  MISO states that it does not anticipate that parties will execute the Border Winds FCA until they receive the requested clarification.

14.    Otter Tail asserts that the Border Winds FCA Order:  (1) fails to address whether the comparability principle requires the Commission to allow the transmission owner to elect to initially fund network upgrades under MISO's *pro forma* FCA, just as they are allowed in MISO's *pro forma* GIA; (2) fails to recognize that Otter Tail's particular situation justifies acceptance of the non-conforming FCA; (3) errs by effectively rejecting a proposed non-conforming FCA and ordering the replacement of it with a *pro forma* FCA without instituting a proceeding under FPA section 206; and (4) discriminates

---

[26] MISO Request for Rehearing and Clarification, Docket No. ER14-2464-002, at 5-6 (filed Jan. 12, 2015).

[27] *Id.* at 5.

[28] *Id.* at 6 (citing *Midwest Indep. Transmission Sys. Operator, Inc.*, 116 FERC ¶ 61,306, at PP 4-5 (2006)).

[29] *Id.* at 7.

Docket No. ER14-2464-002, *et al.*                                    - 9 -

against Otter Tail by rejecting the Border Winds FCA, when the Commission has accepted non-conforming FCAs in the past under similar circumstances.[30]

15.    Otter Tail states that the principle of comparability requires that similarly situated entities receive similar treatment, and argues that this principle was incorporated into generator interconnection policies through the Order No. 2003 proceedings.[31]  Otter Tail states that the Commission explained in Order No. 2003-A that "'[w]ith regard to the pricing of Network Upgrades on Affected Systems,' the Commission's 'interconnection pricing policy as it applies to an Affected System Operator that is not independent *should be consistent* with the policy [it] adopt[ed] for the non-independent Transmission Provider.'"[32]  Additionally, Otter Tail asserts that neither the Order No. 2003 *pro forma* LGIA nor MISO's *pro forma* GIA expressly prohibit initial funding by an affected system operator of network upgrades on its transmission system, and further notes that MISO has expressly offered to modify its own *pro forma* FCA to explicitly allow such initial funding.[33]  Otter Tail argues that affected system operators are similarly situated to directly-connected transmission owners, and that the Commission erred by failing to accept the non-confirming provision in the Border Winds FCA giving Otter Tail the same right to elect to initially fund network upgrades that is given to transmission owners in MISO's *pro forma* GIA.[34]

16.    Otter Tail contends that it did show that a novel legal issue or other unique factor warrants the acceptance of the non-conforming Border Winds FCA.[35]  Otter Tail states that the Border Winds FCA is the first filing where an affected system operator has requested to provide the initial funding for network upgrades necessary to facilitate the generator interconnection, and argues that this presents a novel legal issue of the application of the initial funding option to an FCA, as well as a unique factual

---

[30] Otter Tail Request for Rehearing, Docket No. ER14-2464-002, at 1-2 (filed Jan. 12, 2015).

[31] *Id.* at 12-13.

[32] *Id.* at 13 (citing Order No. 2003-A, FERC Stats. & Regs. ¶ 31,160 at P 636 (emphasis added)).  Otter Tail notes that the reference to "non-independent" refers to vertically-integrated utilities like Otter Tail.

[33] *Id.* at 14.

[34] *Id.* at 13-14.

[35] *Id.* at 15.

circumstance.[36]  Furthermore, Otter Tail argues that the proposed non-conforming provisions are more than merely consistent with or superior to the *pro forma* provisions of MISO's FCA because the comparability principle requires the addition of the initial funding option to the FCA.[37]  Otter Tail argues that the Commission has discriminated against Otter Tail by rejecting its non-conforming provisions when, in the past, the Commission has accepted non-conforming provisions when the agreement provides for the transmission owner's election to initially fund upgrades under terms not contemplated in the *pro forma* agreement, and has accepted this option under MISO's *pro forma* GIA.[38]  Otter Tail also states that the Commission has accepted non-conforming provisions in a GIA when the agreement requests a type of interconnection not contemplated by a *pro forma* GIA,[39] or the agreement involves a non-jurisdictional municipal utility.[40]  Otter Tail argues that the Commission's decision to reject the non-conforming provisions of the Border Winds FCA fails to acknowledge, much less differentiate, the Commission's prior acceptance of non-conforming agreements without novel legal issues or factual circumstances.[41]

17.    Otter Tail claims that the Commission does not have the authority to reject a proposed non-conforming FCA and order it to be replaced with a *pro forma* FCA without instituting an FPA section 206 proceeding.[42]  Otter Tail explains that the courts have made clear that the Commission bears the burden under section 206 of the FPA whenever

---

[36] *Id.* at 16-17.

[37] *Id.* at 17.

[38] *Id.* at 20-21 (citing *Southern California Edison Co.*, 133 FERC ¶ 61,200, at P 35 (2010); *Southern California Edison Co.*, 133 FERC ¶ 61,019, at PP 5, 37 (2010); *Southern California Edison Co.*, 132 FERC ¶ 61,150, at P 30 (2010)).

[39] *Id.* at 16 (citing *New York Indep. Sys. Operator, Inc.*, 139 FERC ¶ 61,180, at P 9 (2012); *New York Indep. Sys. Operator, Inc.*, 135 FERC ¶ 61,264, at P 14 (2011); *Southwest Power Pool, Inc.*, 134 FERC ¶ 61,224, at P 12 (2011)).

[40] *Id.* (citing *Southwest Power Pool, Inc.*, 146 FERC ¶ 61,073, at P 10 (2014); *Midwest Indep. Transmission Sys. Operator, Inc.*, 131 FERC ¶ 61,199, at P 6 (2010)).

[41] *Id.* at 21 (citing *Midwest Indep. Transmission Sys. Operator, Inc.*, 120 FERC ¶ 61,066, at P 35 (2007) (*Endeavor*)).

[42] *Id.* at 18.

it moves beyond rejection of a proposed rate to the task of redesigning it,[43] and argues that the Commission went beyond rejecting proposed modifications to the MISO *pro forma* FCA when it imposed its own rates by ordering the use of the *pro forma* FCA. Otter Tail argues that directing MISO to secure an executed FCA is out of MISO's control and is tantamount to taking away from MISO, Otter Tail, and Border Winds the liberty of contract, and amounts to dictating redesign of the FCA rather than allowing for MISO to remove the rejected language and proceed with an alternate route for moving forward with the Border Winds FCA.[44] Otter Tail states that if the Commission does not grant rehearing it should allow MISO, Otter Tail, and Border Winds to attempt to negotiate an executed *pro forma* FCA, or, in the alternative, file an unexecuted *pro forma* FCA. Further, Otter Tail claims that in the past, when the Commission has rejected a non-conforming interconnection agreement, it has allowed parties to refile a new FCA rather than forcing them to execute an agreement.[45]

18.    Otter Tail requests a stay of the Border Winds FCA Order and other interim relief as may be necessary to ensure that the Border Winds FCA as filed is in effect from July 18, 2014 until the Commission accepts the agreement on rehearing or a replacement agreement is finalized.[46] Otter Tail explains that the stay is necessary to work through several practical issues that would affect the schedule for construction of the network upgrades that are the subject of the Border Winds FCA, which include:  (1) how to compensate Otter Tail for its funding of the project to date; (2) how and when to transition to Option 2-style funding; and (3) how to address its financial exposure in the event that the Border Winds FCA is terminated while the effect of the Border Winds FCA Order is uncertain.[47] Otter Tail requests a shortened answer period of five days for its request for stay and interim relief.[48]

---

[43] *Id.* (citing *Wisconsin Pub. Serv. Corp.*, 120 FERC ¶ 61,269, at P 91 (2007); *W. Res. v. FERC*, 9 F.3d 1568, 1579 (D.C. Cir. 1993); *Atl. City Elec. Co. v. FERC*, 295 F.3d, 1, 10 (D.C. Cir. 2002)).

[44] *Id.* at 19.

[45] *Id.* at 19-20 (citing *Endeavor*, 120 FERC ¶ 61,066 at P 35).

[46] *Id.* at 22-23.

[47] *Id.* at 22.

[48] *Id.* at 23.

19.     Border Winds and the American Wind Energy Association (AWEA) filed answers to the requests for rehearing in Docket No. ER14-2464-002.

**D.     Discussion**

**1.     Procedural Issues**

20.     Rule 713(d)(1) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.713(d)(1) (2014), prohibits an answer to a request for rehearing.  Therefore, we reject the answers of Border Winds and AWEA.

**2.     Substantive Issues**

21.     In response to MISO's request for clarification, we clarify that, in the Border Winds FCA Order, the Commission rejected the use of the initial funding option in the Border Winds FCA; MISO is required to remove the non-conforming language from the agreement and revise the agreement to conform to MISO's *pro forma* FCA.  Thus, the revised Border Winds FCA will not provide Otter Tail with the option to elect to provide the initial funding for network upgrades, consistent with MISO's *pro forma* FCA.  We further clarify that this holding is specific to the Border Winds FCA.

22.     We deny the requests for rehearing of the Border Winds FCA Order.  As noted in the Border Winds FCA Order, although the Commission has encouraged the use of *pro forma* agreements because a *pro forma* agreement minimizes opportunities for undue discrimination,[49] the Commission recognizes that agreements that do not conform to *pro forma* agreements may be necessary in situations with specific reliability concerns, novel legal issues, or other unique factors.  The Commission has stated that a transmission provider seeking Commission acceptance of a non-conforming agreement bears a high burden to justify that the non-conforming aspects of the agreement are not merely "consistent with or superior to" a *pro forma* agreement, but are in fact *necessary*.[50]

23.     We find that MISO's proposed non-conforming deviations merely reflect Otter Tail's preference to elect to initially fund network upgrades, an option that is not available to Otter Tail under MISO's *pro forma* FCA.  MISO and Otter Tail did not show that this particular interconnection, or the network upgrades necessary to facilitate the interconnection, involves any unique factual or technical characteristics, novel legal

---

[49] Border Winds FCA Order, 149 FERC ¶ 61,224 at PP 23-24 (citing Order No. 2003, FERC Stats. & Regs. ¶ 31,146 at PP 11, 12).

[50] *Id.* P 24 (citing *PJM Interconnection, L.L.C.*, 111 FERC ¶ 61,163 (2005)).

issues, or particular reliability concerns that would distinguish this interconnection from others and require deviations from the *pro forma* FCA. Although Otter Tail asserts that the non-conforming provisions are superior to the *pro forma* FCA from Otter Tail's perspective, Otter Tail does not meet the high burden to justify its proposed deviations as necessary. Border Winds, the interconnection customer that is obligated to pay for network upgrades under MISO's Interconnection Customer Funding Policy, opposed the addition of the non-conforming language, which provides evidence that the non-conforming deviations were not in fact necessary for this interconnection and distinguishes the Border Winds FCA proceeding from the other proceedings cited to by the parties. Otter Tail has not demonstrated how the underlying interconnection requires a cost recovery mechanism other than that which is provided in the *pro forma* FCA.[51] Because the Border Winds FCA did not meet the Commission's standard for deviations from a *pro forma* agreement, we affirm the Commission's rejection of these non-conforming deviations from MISO's *pro forma* FCA.[52]

24.     We disagree with Otter Tail's assertion that the Commission erred in failing to address its comparability argument and that the comparability principle requires acceptance of the Border Winds FCA. The issue in the Border Winds FCA Order was whether MISO's proposed deviations from the *pro forma* FCA met the Commission's standards for non-conforming deviations. The Commission properly found that MISO and Otter Tail did not meet their high burden to justify the non-conforming language proposed in the Border Winds FCA. The issue of comparability does not present a novel legal issue or unique circumstance specific to this interconnection; rather, the addition of the initial funding option to the Border Winds FCA would confer benefits specifically and solely to Otter Tail.[53] MISO and Otter Tail failed to show that the non-conforming

---

[51] *See Midwest Indep. Transmission Sys. Operator, Inc.*, 141 FERC ¶ 61,203, at P 13 (2012) (finding that the filing parties did not demonstrate how the location of the interconnection underlying an FCA requires a non-conforming cost recovery mechanism).

[52] We also disagree with Otter Tail's assertion that the Commission failed to acknowledge and follow its prior precedent accepting non-conforming provisions. Otter Tail Request for Rehearing at 16, 20-21. Each case presents different factual circumstances, and in those cases, unlike here, the parties met their burden to show that there were unique circumstances of the interconnection that required non-conforming provisions.

[53] A novel legal issue might exist, for example, where a *pro forma* agreement would be inconsistent with state law. *See Southwest Power Pool*, 146 FERC ¶ 61,073, at PP 8-10 (2014); *Midwest Indep. Sys. Operator, Inc.*, 131 FERC ¶ 61,199, at P 6 (2010).

provision is necessary to reflect extraordinary circumstances associated with this interconnection. If affected system operators should be afforded the same option available to transmission owners under MISO's *pro forma* GIA, these benefits should be made available to all affected system operators in a transparent, non-discriminatory manner so that MISO cannot favor Otter Tail over other affected system operators in an unduly discriminatory manner.[54]

25.    Moreover, we deny MISO's suggestion to accept the proposed non-conforming provisions in the Border Winds FCA and allow MISO to modify its *pro forma* FCA to ensure that this option is available to all parties, as that suggestion would have us apply non-conforming language in an unexecuted FCA over the objection of the interconnection customer, and then apply that same non-conforming language to all interconnection customers in MISO FCAs, without any process for the impacted customers. We note that, in the cases where the Commission conditioned acceptance of non-conforming provisions on MISO filing changes to the *pro forma* agreement, the non-conforming provisions provided additional service opportunities that would not otherwise be available, and they did not harm or adversely impact any customers.[55] We affirm the Commission's conditional acceptance of the non-conforming Border Winds FCA, subject to MISO filing a revised Border Winds FCA that retains the provisions of the *pro forma* FCA, consistent with Commission precedent.[56]

26.    We disagree with Otter Tail's assertion here that the Commission must institute a proceeding under section 206 of the FPA, because, Otter Tail argues, in rejecting the non-conforming Border Winds FCA and imposing the *pro forma* FCA language, the Commission was actually redesigning a rate. Otter Tail's argument, if accepted, would undercut the purpose of a *pro forma* agreement. MISO's *pro forma* FCA serves as a way to minimize undue discrimination and eliminate the need for parties to negotiate the individual terms of each agreement. As the Commission has stated, if parties want to negotiate provisions that deviate from the *pro forma* agreement, that agreement must be filed for Commission approval under section 205 of the FPA, and the transmission provider bears the high burden to justify that the non-conforming provisions are

---

[54] *See MidAmerican Energy Co.*, 116 FERC ¶ 61,018, at P 12 (2006); *Midwest Indep. Transmission Sys. Operator, Inc.*, 115 FERC ¶ 61,257, at PP 23-24 (2006).

[55] *See Midwest Indep. Transmission Sys. Operator, Inc.*, 116 FERC ¶ 61,009 (2006).

[56] *See Midwest Indep. Transmission Sys. Operator, Inc.*, 141 FERC ¶ 61,203, at P 16 (2012) (conditionally accepting a non-conforming FCA, subject to MISO filing a revised FCA that retains the provisions of the *pro forma* FCA); *Midwest Indep. Transmission Sys. Operator, Inc.*, 137 FERC ¶ 61,223, at P 15 (2011).

Docket No. ER14-2464-002, *et al.*                                                         - 15 -

necessary due to specific reliability concerns, novel legal issues, or other unique factors.[57] The Commission determined in the Border Winds FCA Order that MISO did not meet this burden because it did not show that the non-conforming provisions of the Border Winds FCA were necessary; therefore, the Commission ordered MISO to revise the Border Winds FCA to conform to MISO's *pro forma* FCA.[58]  Thus, the Commission did not redesign any rate or impose a new rate, but only required the Border Winds FCA to remain consistent with MISO's Commission-approved *pro forma* Tariff language. Furthermore, we disagree with Otter Tail's argument that the Commission is denying the parties to the Border Winds FCA the liberty to contract.  The agreement was filed unexecuted because the interconnection customer determined that negotiations were at impasse regarding inclusion of the non-conforming language.  Because the Commission found that Otter Tail did not justify the inclusion of the non-conforming language, there is no longer any obstruction to executing the FCA once it is revised to apply the standard funding mechanism, consistent with MISO's *pro forma* FCA.

27.     We deny Otter Tail's request for a stay and interim relief.  In order to ensure finality in Commission proceedings, the Commission typically does not stay its orders.[59] When evaluating a request for stay of an order, the Commission considers:  (1) whether the moving party will suffer irreparable injury without a stay; (2) whether issuing a stay

---

[57] *See PJM Interconnection, LLC*, 111 FERC ¶ 61,163 (2005).

[58] *See Midwest Indep. Transmission Sys. Operator, Inc.,* 149 FERC ¶ 61,224, at PP 24-26 (2014).  The Commission has in several prior cases made similar determinations rejecting non-conforming agreements and imposing the *pro forma* language.  *See, e.g., Southwest Power Pool, Inc.*, 132 FERC ¶ 61,159 (2010) (rejecting a non-conforming meter agent agreement and directing the transmission provider to revise the agreement to conform to the *pro forma* meter agent agreement); *MidAmerican Energy Co.*, 116 FERC ¶ 61,018 (2006) (rejecting non-conforming deviations including stylistic changes, clarifying phrases, and modifications to insurance provisions; rejecting deviations that were requested by the customer; and rejecting deviations that the customer asserted were necessary to reflect the positions of the parties); *Midwest Indep. Transmission Sys. Operator*, *Inc*., 111 FERC ¶ 61,421 (2005) (rejecting deviations to correct mistakes in the *pro forma* agreement); *PJM Interconnection, LLC*, 111 FERC ¶ 61,163 (2005) (rejecting a one-sided indemnification provision and changes corresponding to a cancelled agreement).

[59] *Midwest Indep. Transmission Sys. Operator, Inc.*, 111 FERC ¶ 61,142, at PP 17-18 (2005).

will substantially harm other parties; and (3) whether a stay is in the public interest.[60] Moreover, the Commission has found that irreparable injury must be more than unfavorable circumstances, loss or loss of profits.[61] Otter Tail has not met the burden to show that it will suffer irreparable injury without a stay and that a stay is in the public interest. As affirmed, the Border Winds FCA Order rejects the proposed initial funding option in the Border Winds FCA, and as a result, the parties should be in a position as if Border Winds funded the upgrades from the start. Thus, there is no question as to when to transition to Option 2 funding, and there remains no uncertainty as to the effect of the Border Winds FCA Order. Furthermore, Border Winds has provided a source for the payment for the network upgrades associated with the Border Winds FCA in the form of security posted in a cash-funded escrow account on July 17, 2014.[62]

## III.     Otter Tail Complaint Proceeding, Docket No. EL15-36-000

### A.     Otter Tail Complaint

28.     On January 12, 2015, Otter Tail filed a complaint, pursuant to sections 206 and 306 of the FPA,[63] alleging that MISO's Tariff is unjust and unreasonable to the extent that the *pro forma* FCA contained therein does not permit an affected system operator to elect to provide the initial funding for network upgrades, a right which is provided to directly-connected transmission owners under MISO's *pro forma* GIA.[64] Otter Tail requests that the Commission direct MISO to revise the Tariff to include a provision in the *pro forma* FCA that permits an affected system operator to elect to initially fund network upgrades. Otter Tail also requests fast-track processing of the complaint to allow Otter Tail to elect to initially fund the network upgrades associated with upcoming indirect interconnections between new generation sources and the Otter Tail transmission system.[65]

---

[60] *See, e.g., Ameren Servs. Co.,* 127 FERC ¶ 61,121, at P 44 (2009); *Town of Norwood v. National Grid*, 115 FERC ¶ 61,396 (2006).

[61] *Olympic Pipe Line Co.*, 102 FERC ¶ 61,055, at P 17 (2003).

[62] MISO Border Winds FCA Filing, Tab B, Appendix A to the FCA, Table 1.

[63] 16 U.S.C. §§ 824e, 825e (2012).

[64] Otter Tail Complaint at 1.

[65] *Id.* at 1, 23.

29.     Otter Tail argues that there is no meaningful distinction between an affected system operator under an FCA and a transmission owner under a GIA, because an affected system operator is simply a transmission owner that is not directly connected to the interconnection customer.  Otter Tail claims that the Commission's principle of comparability, which requires that similarly situated parties be treated equally, requires that affected system operators and directly-connected transmission owners be afforded the same rights under the MISO Tariff.[66]  Otter Tail states that "the cornerstone of the Commission's comparability principle is section 205(b) of the FPA, which prohibits undue discrimination,"[67] and that the Commission has stated that the protection against undue discrimination prohibits the dissimilar treatment of similarly situated entities.[68]

30.     Otter Tail states that the Commission has recognized since Order No. 2003 that affected system operators and directly connected transmission owners perform similar functions and are equally necessary to the interconnection process.[69]  Otter Tail references Order No. 2003 to support its position.  Specifically, Otter Tail cites to Order 2003-A, where the Commission stated: "[w]ith regard to the pricing of Network Upgrades on Affected Systems, the Commission concludes . . . that our interconnection pricing policy as it applies to an Affected System Operator that is not independent should be consistent with the policy we adopt for the non-independent Transmission Provider."[70] Otter Tail also references Order No. 2003-C, where the Commission noted its policy of "treating a non-independent Affected System Operator the same as a non-independent Transmission Provider because both have the same incentive to frustrate the development of new, competitive generation."[71]

---

[66] *Id.* at 10 (citing *Southern Caliornia Elec. & Gas Co.*, 143 FERC ¶ 61,058, at P 48 (2013) ("The comparability principle requires public utility transmission providers . . . to develop a transmission system plan that meets the specific service requests of their transmission customers and otherwise treats similarly-situated customers . . . comparably in transmission system planning."), *order on reh'g*, 147 FERC ¶ 61,126 (2014); *PJM Interconnection, L.L.C.*, 129 FERC ¶ 61,161, at P 63 (2009)).

[67] *Id.* (quoting 16 U.S.C. § 824d(b) (2012)).

[68] *Id.* at 10-11 (citing *Western Grid Dev. LLC*, 133 FERC ¶ 61,029, at P 17 (2010)).

[69] *Id.* at 2.

[70] *Id.* at 11-12 (quoting Order No. 2003-A, FERC Stats. & Regs. ¶ 31,160 at P 636).

[71] *Id.* at 12 (quoting Order No. 2003-C, FERC Stats. & Regs. ¶ 31,190 at P 13).

31.     Otter Tail submitted with its complaint the affidavit of Mr. Dean Pawlowski, which Otter Tail argues demonstrates that there is no technical or engineering reason to treat network upgrades made in response to direct generator interconnections any differently than network upgrades made in response to indirect impacts from generator interconnections.[72]  Otter Tail states that the Pawlowski Affidavit illustrates that, when funding and constructing network upgrades to facilitate the integration of new generation sources to its transmission system, regardless of whether a generator directly or indirectly connects with the transmission system, Otter Tail must conduct the same facilities studies, complete similar engineering and procurement tasks, and pay for similar services and materials.[73]  The Pawlowski Affidavit explains that Otter Tail does not prioritize network upgrades for direct interconnections over those needed to respond to indirect impacts.[74]  Otter Tail thus argues that it treats and responds to direct and indirect interconnection impacts and their attendant system upgrade needs in a non-discriminatory manner.[75]

32.     Otter Tail argues that, consistent with Commission precedent, an affected system operator should be able to elect to initially fund network upgrades and recover capital costs for those upgrades through a network upgrade charge established using the formula in Attachment GG of the Tariff.  Otter Tail cites *Hoopeston*, where the Commission determined that it is just and reasonable for a transmission owner under a GIA to elect to initially fund necessary network upgrades and recover from the interconnection customer a return of and on the capital costs of the network upgrades.[76]  Otter Tail states that the Commission noted in *Hoopeston* that the transmission owner's decision to initially fund network upgrades was consistent with Orders Nos. 2003 and 2003-A.[77]  Otter Tail also cites a case in which an executed GIA allowing a transmission owner to elect to initially fund network upgrades was accepted under delegated authority.[78]

---

[72] *Id.* at 14 (citing Ex. No. Otter Tail-1 at ¶ 10) (Pawlowksi Affidavit).

[73] *Id.* at 15 (citing Pawlowski Affidavit at ¶ 6).

[74] *Id.* at 15-16 (citing Pawlowski Affidavit at ¶ 7).

[75] *Id.* at 16 (citing Pawlowski Affidavit at ¶ 7).

[76] *Id.* at 13 (citing *Hoopeston*, 145 FERC ¶ 61,111 at P 41).

[77] *Id.* (citing Order No. 2003-A, FERC Stats. & Regs. ¶ 31,160 at P 720).

[78] *Id.* (citing *Midwest Indep. Transmission Sys. Operator, Inc.*, Docket No. ER13-125-000, at 1 (Dec. 12, 2012) (delegated letter order)).

33.     Otter Tail states that Article 11.3 of MISO's *pro forma* GIA expressly permits a
transmission owner to elect to provide the initial funding for network upgrades,[79] and
therefore, to ensure that an affected system operator and a transmission owner are treated
comparably, Otter Tail requests that section 3.2.1 of MISO's *pro forma* FCA be revised
as follows:

> Costs.  Interconnection Customer shall pay to the Transmission Owner
> costs (including taxes and financing costs) associated with seeking and
> obtaining all necessary approvals and of designing, engineering,
> constructing, and testing the Network Upgrades and System Protection
> Facilities, as identified in Appendix A, in accordance with the cost recovery
> method provided herein, *except to the extent that Transmission Owner has
> elected to self-fund the Network Upgrades and System Protection Facilities
> as detailed in Appendix A.*[[80]]

Otter Tail also notes that it may be necessary to make additional revisions to the FSA
contained in Appendix A of the *pro forma* FCA to correspond with the aforementioned
changes.[81]

34.     Otter Tail argues that the cost impact of not having the option to initially fund
network upgrades under the *pro forma* FCA includes the opportunity cost of Otter Tail
being forced to use Option 2 funding, which in turn includes the inability to fund network
upgrades up-front and recover a return of and on such payments from the interconnection
customer.[82]  Otter Tail also argues that not having the initial funding option could impede
future network upgrades from being undertaken or completed in a timely fashion.  Otter
Tail states that it could envision a scenario in which an interconnection customer must
forego or delay interconnection because it does not have the financial resources to fund
all the necessary network upgrades up-front and, because some of the network upgrades
are on an affected system operator's transmission system, the affected system operator

---

[79] *Id.* at 16 (citing MISO Tariff, FERC Electric Tariff, Attachment X (Generator
Interconnection Procedures), Appendix 6 (Generator Interconnection Agreement), art.
11.3 (37.0.0)).

[80] *Id.* at 17 (citing MISO Tariff, FERC Electric Tariff, Attachment X (Generator
Interconnection Procedures), Appendix 8 (Facilities Construction Agreement), art. 3.2.1
(35.0.0)) (proposed revision in italics).

[81] *Id.*

[82] *Id.* at 20-21.

would have no choice but to require the interconnection customer to provide the up-front funding.[83]

35.     Otter Tail asserts that its complaint is not barred by the doctrine of collateral estoppel, which would prevent parties from reviving issues that were previously decided against them or that should have been presented as part of a prior litigated matter.[84]  Otter Tail argues the issue now before the Commission is not the same issue the Commission faced in the Border Winds FCA Order.  Otter Tail states that, in its complaint, it asks whether MISO's *pro forma* FCA is unjust and unreasonable to the extent that it does not permit an affected system operator to elect to provide the initial funding for network upgrades on a comparable basis to that of similarly situated transmission owners.  Otter Tail states that, in the Border Winds FCA Order, the issue before the Commission was whether MISO had met its burden to justify the proposed non-conforming provisions of the Border Winds FCA, and the Commission did not address whether an affected system operator should be permitted to initially fund network upgrades in MISO.[85]  Additionally, Otter Tail argues that its complaint is not a collateral attack on the Border Winds FCA Order because the Commission has never reached a merits decision on whether it is unjust and unreasonable for MISO's *pro forma* FCA not to contain an initial funding option comparable to the one in MISO's *pro forma* GIA.[86]  Otter Tail also notes that the doctrine of *res judicata*, or claim preclusion, is also inapplicable to this proceeding because this complaint does not seek to re-litigate the non-conforming FCA that was at issue in the Border Winds FCA Order.[87]

## B.     Notice and Responsive Pleadings

36.     Notice of the complaint was published in the *Federal Register*, 80 Fed. Reg. 2691 (2015), with answers, protests, and interventions due on or before February 2, 2015.  On February 2, 2015, MISO filed an answer to the complaint.

37.     International Transmission Company d/b/a ITC*Transmission*, Michigan Electric Transmission Company, LLC, and ITC Midwest LLC (collectively, ITC Companies) filed a timely motion to intervene and comments.  Exelon Corporation, Calpine

---

[83] *Id.* at 21.

[84] *Id.* at 17-18.

[85] *Id.* at 18.

[86] *Id.* at 17, 19.

[87] *Id.* at 19 n.59.

Corporation, Ameren Services Company, E.ON Climate & Renewables North America LLC, the MISO Transmission Owners,[88] EDF Renewable Energy, Inc., Xcel Energy Services Inc., AWEA, and Wind on the Wires (WOW) filed timely motions to intervene. AWEA and WOW filed a timely protest of the complaint.

38.    Although MISO states that it is in general agreement with and does not specifically dispute any of the factual allegations contained in the complaint, MISO contends that the issues presented in the complaint are pending before the Commission in Docket No. ER14-2464-002, and timely resolution can be achieved in that docket.[89] MISO states that it has sought clarification in the aforementioned docket because it believes the Border Winds FCA Order could be read in two ways; one that directed removal of the non-conforming language and rejected the initial funding option, and one that directed removal of the language in question but permitted the initial funding option.[90]    MISO asserts that the issues pending on rehearing in Docket No. ER14-2464-

_____

[88] The MISO Transmission Owners for this proceeding consist of:  American Transmission Company LLC; Big Rivers Electric Corporation; Central Minnesota Municipal Power Agency; City Water, Light & Power (Springfield, IL); Cleco Power LLC; Dairyland Power Cooperative; Duke Energy Business Services, LLC for Duke Energy Indiana, Inc.; East Texas Electric Cooperative; Entergy Arkansas, Inc.; Entergy Louisiana, LLC; Entergy Gulf States Louisiana, L.L.C.; Entergy Mississippi, Inc.; Entergy New Orleans, Inc.; Entergy Texas, Inc.; Great River Energy; Hoosier Energy Rural Electric Cooperative, Inc.; Indiana Municipal Power Agency; Indianapolis Power & Light Company; MidAmerican Energy Company; Minnesota Power (and its subsidiary Superior Water, L&P); Missouri River Energy Services; Montana-Dakota Utilities Co.; Northern Indiana Public Service Company; Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.; Northwestern Wisconsin Electric Company; Prairie Power Inc.; South Mississippi Electric Power Association; Southern Illinois Power Cooperative; Southern Indiana Gas & Electric Company (d/b/a Vectren Energy Delivery of Indiana); Southern Minnesota Municipal Power Agency; Wabash Valley Power Association, Inc.; and Wolverine Power Supply Cooperative, Inc.

[89] MISO Answer to the Complaint, Docket No. EL15-36-000, at 4 (filed Feb. 2, 2015).  MISO asserts in that Rule 206(b)(6) of the Commission's Rules of Practice and Procedure provides that a complaint must: "State whether the issues presented are pending in an existing Commission proceeding or a proceeding in any other forum in which the complainant is a party, and if so, provide an explanation why timely resolution cannot be achieved in that forum[.]"  *Id.* at 4 n.8 (citing 18 C.F.R. § 385.206(b)(6) (2014)).

[90] *Id.* at 7.

002 could be resolved, and the complaint mooted, by the Commission accepting the non-conforming edits to the Border Winds FCA and ordering MISO to include such provisions in the *pro forma* FCA in the rehearing proceedings.[91]

39.     Although MISO argues that the initial funding option is currently available under its *pro forma* FCA, based on Commission precedent,[92] MISO states that it is amenable to making revisions to its Tariff and *pro forma* FCA to explicitly allow an affected system operator to elect to provide the initial funding for network upgrades.[93]  Further, MISO states that it believes that the initial funding option should be available to transmission owners and affected system operators under MISO's *pro forma* MPFCA, FCA, and GIA, as the upgrades contemplated under these agreements are essentially the same.  Thus, to the extent that the Commission determines it is appropriate to address the *pro forma* FCA and MPFCA in this complaint proceeding, MISO states it is willing to amend the MISO Tariff to clarify that the initial funding option is available under the MISO *pro forma* MPFCA.[94]

40.     ITC Companies support Otter Tail's position that MISO's *pro forma* FCA should be revised to include a provision that allows an affected system operator to provide the initial funding for network upgrades.  ITC Companies reference *Hoopeston* to reinforce the point that a transmission owner directly connected to an interconnection customer may elect to initially fund network upgrades.[95]  ITC Companies reiterate Otter Tail's argument that the transmission owner and the affected system operator are obligated to perform similar functions and are equally necessary to the interconnection process, and therefore, it is just and reasonable to treat an affected system operator comparably to the directly-connected transmission owner.[96]

---

[91] *Id.* at 7-8.

[92] *Id.* at 9 (citing *Hoopeston*, 145 FERC ¶ 61,111 at P 42 n.62; Order No. 2003, FERC Stats. & Regs. ¶ 31,146 at P 720).

[93] *Id.* at 2.

[94] *Id.* at 3, 8-10.

[95] Motion to Intervene and Comments of the ITC Companies, Docket No. EL15-36-000, at 1, 3 (filed Jan. 30, 2015) (ITC Companies Comments).

[96] *Id.* at 3.

41.     ITC Companies argue that an affected system operator that elects to initially fund network upgrades should not be limited to calculating its revenue requirement for network upgrades pursuant to Attachment GG, but rather should be able to calculate its revenue requirement in any manner that is just and reasonable, given the relevant circumstances of each case.  ITC Companies reference a template accepted by the Commission in Docket No. ER15-884-001 as an example of an alternative methodology for calculating the revenue requirement for network upgrades the transmission owner proposes to initially fund.[97]  ITC Companies suggest that any proposed revisions to MISO's *pro forma* FCA should provide an affected system operator the flexibility to calculate the revenue requirement for network upgrades in any manner that is just and reasonable, given the circumstances of each case.[98]

42.     AWEA and WOW request that the Commission reject the complaint without prejudice or, in the alternative, set the matter for hearing.[99]  AWEA and WOW argue that Otter Tail has bypassed MISO's committee and stakeholder process, which they argue is the first step for amending MISO's Tariff to include the initial funding option in its *pro forma* FCA.[100]  AWEA and WOW argue that Otter Tail provides no evidence that it raised the present issue in the appropriate MISO committee, or that MISO has thwarted Otter Tail's attempt to do so.[101]  AWEA and WOW assert that, if the Commission grants Otter Tail's request for relief, it would signal to industry participants that the committee and stakeholder process can be bypassed whenever a market participant desires, and

---

[97] *See* ITC Holdings Corp., Docket No. ER15-884-001 (May 14, 2015) (unpublished letter order).  This FSA implements the initial funding option and establishes a charge to recover the return of and on the costs of the network upgrades, i.e., the monthly revenue requirement, using a formula that calculates a levelized fixed charge rate based on the initial capital cost, the term of the facilities services agreement, and certain data from the ITC Midwest Attachment O Formula Rate under the MISO Tariff, including:  (i) the ITC Midwest combined tax rate; (ii) the ITC Midwest interest rate on long term debt; (iii) the long term debt and common equity balances; and (iv) the Commission-approved return on equity for ITC Midwest.  *See* MISO Facilities Service Agreement Filing, Docket No. ER15-884-000, Transmittal Letter at 1-3 (filed Jan. 21, 2015).

[98] ITC Companies Comments at 4.

[99] Protest of the American Wind Energy Association and Wind on the Wires, Docket No. EL15-36-000, at 1 (filed Feb. 2, 2015).

[100] *Id.* at 2-4.

[101] *Id.* at 2.

would be contrary to the required Commission-approved independent system operator or regional transmission organization business practices and procedures related to the board of directors' responsiveness to customers and other stakeholders.[102]

43.    AWEA and WOW argue that the initial funding issue is an issue of first impression and requires adequate opportunity for debate and discussion among affected regional stakeholders to vet costs, benefits, and implications.[103]    AWEA and WOW argue that the Commission in Order No. 2003 did not discuss the ability of the transmission owner to provide the initial funding for network upgrades on an affected transmission system that neighbors an interconnecting transmission owner under an FCA, and that it has not discussed in a MISO proceeding before the Commission the initial funding option under the *pro forma* FCA.  AWEA and WOW note that the relief Otter Tail seeks is not limited to its system and facilities, but could impact all transmission owners and customers in the region.

44.    AWEA and WOW argue that, contrary to Otter Tail's claim that the inability to initially fund network upgrades could impede future network upgrades from being undertaken or completed in a timely manner, no interconnection customer has made such a claim, and numerous FCAs have been executed within MISO with no delays.[104] Further, AWEA and WOW state that if the interconnection customer would prefer the transmission owner to elect to provide the initial funding for network upgrades, this ability should be the choice of the interconnection customer, rather than the prerogative of the transmission owner to impose its costs of capital on the interconnection customer.[105]    In response to Otter Tail's request for fast-track processing, which Otter Tail argues is critical to support near future indirect interconnections between new generation sources and its transmission system, AWEA and WOW argue that the current *pro forma* FCA has not caused delays or adversely impacted the interconnection customer's ability to provide its own up-front funding.[106]

---

[102] *Id.* at 4-5 (citing 18 C.F.R. § 35.28(g)(6) (2014)).

[103] *Id.* at 5.

[104] *Id.*

[105] *Id.* at 5-6.

[106] *Id.* at 7-8.

45.    AWEA and WOW request that, if the Commission grants the complaint, it should set the matter for hearing, as factual support addressing the costs, benefits and impacts is needed.[107]  Furthermore, AWEA and WOW note that, due to the nationwide implication of the revisions to the *pro forma* FCA that Otter Tail is seeking, the Commission should consider allowing industry-wide comment.

## C.    Discussion

### 1.    Procedural Matters

46.    Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2014), the timely, unopposed motions to intervene serve to make the entities that filed them parties to this proceeding.

### 2.    Substantive Matters

#### a.    The Transmission Owner's Election to Provide Initial Funding for Network Upgrades

47.    We grant Otter Tail's complaint in part because we agree with Otter Tail, ITC Companies, and MISO that the customers of an affected system operator under MISO's *pro forma* FCA or MPFCA and the customers of a directly-connected transmission owner under MISO's *pro forma* GIA are similarly situated, and the comparability principle requires similarly situated customers to be treated comparably in the transmission system planning context.[108]  In Order No. 2003, the Commission recognized that affected system operators and directly-connected transmission owners perform similar functions and are equally necessary to the interconnection process.  For instance, the Commission recognized that in some instances, "Network Upgrades must be constructed on Affected Systems to protect the reliability of those systems," and stated that "an Affected System Operator may require the Interconnection Customer to pay for all . . . Network Upgrades constructed to accommodate the Interconnection Customer's Interconnection Request."[109]

---

[107] *Id.* at 8.

[108] *See, e.g.*, *South Carolina Elec. & Gas Co.*, 143 FERC ¶ 61,058 at P 48; *see also PJM Interconnection, L.L.C.*, 129 FERC ¶ 61,161 at P 63.

[109] Order No. 2003, FERC Stats. & Regs. ¶ 31,146 at P 29 n.32 and P 738.  In Order No. 2003-A, the Commission stated that, with respect to the pricing of network upgrades on affected system, the Commission's "pricing policy as it applies to an Affected System Operator that is not independent should be consistent with the policy [adopted] for the non-independent Transmission Provider."  Order No. 2003-A, FERC Stats. & Regs. ¶ 31,160 at P 636.  The term "transmission provider" as it is used here also

(continued ...)

20150618-3002 FERC PDF (Unofficial) 06/18/2015

Docket No. ER14-2464-002, *et al.*                                         - 26 -

We are also persuaded by the affidavit submitted with Otter Tail's complaint, which demonstrates that the funding and construction obligations are equal whether the connection of a new generator is direct or indirect, and that both affected system operators and directly-connected transmission owners must conduct the same types of studies, complete similar engineering tasks, and pay for similar types of services in order to complete their respective network upgrades, which are built for the same purpose of interconnecting generation to the transmission system. Therefore, in order to avoid undue discrimination among interconnection customers under MISO's Tariff, we find that the same funding options should be available to all interconnection customers in MISO, regardless of whether their upgrades are governed pursuant to MISO's *pro forma* GIA or MISO's *pro forma* FCA.

48.     However, we deny Otter Tail's complaint in part because we disagree with Otter Tail and MISO that the *pro forma* FCA should adopt the language of MISO's *pro forma* GIA, which currently allows the transmission owner to unilaterally elect to provide the initial funding for network upgrades. Upon review of Article 11.3 of MISO's *pro forma* GIA, it appears that this provision may be similarly unjust, unreasonable, unduly discriminatory or preferential because it allows the transmission owner the discretion to elect to initially fund the upgrades and subsequently assess the interconnection customer a network upgrade charge that is not later reimbursed to the interconnection customer through the provision of credits, which may result in discriminatory treatment by the transmission owner of different interconnection customers. We additionally find that, by *unilaterally* electing to initially fund network upgrades where the interconnection customer is held responsible for such costs and does not receive credits to reimburse it for those costs, pursuant to MISO's Interconnection Customer Funding Policy, the affected system operator or transmission owner may deprive the interconnection customer of other options to finance the cost of the network upgrades that provide more favorable terms and rates. Thus, allowing the transmission owner to charge more for upgrade costs than the interconnection customer may have incurred on its own may result in unjust and unreasonable rates, given interconnection customers' limited ability to receive transmission credits for funding upgrades under MISO's Interconnection Customer Funding Policy.

49.     The unilateral election to initially fund network upgrades in MISO's *pro forma* GIA also triggers the requirement for the interconnection customer to post security on the full cost of the network upgrades over the term of the construction phase and over the

---

refers to a transmission owner because, in the context of an independent system operator or regional transmission organization, the individual utilities continue to own their own systems and are therefore transmission owners.

term of the FSA,[110] which, under Option 2, is only required over the term of the construction phase of the network upgrades. Yet the need for security is a direct result of the transmission owner's election of the initial funding option; such costs would be avoided if the interconnection customer paid the network upgrade costs up-front, as the Tariff would otherwise provide. The security requirement on the network upgrade charge imposes an additional cost on the interconnection customer. An increase to the interconnection customer's total costs of the network upgrades may, in turn, frustrate the development of new, competitive generation, which would contradict a stated purpose of Order No. 2003 to "increas[e] the number and variety of new generation that will compete in the wholesale electricity market."[111] We note that the *unilateral* election to initially fund network upgrades (where the interconnection customer is held responsible for such costs and does not receive credits to reimburse it for those costs, pursuant to MISO's Interconnection Customer Funding Policy), which may increase costs of interconnection service by assigning increased capital costs and a security requirement to the interconnection customer with no corresponding increase in service, shares similar characteristics to those of Option 1, which the Commission eliminated in *E.ON*.[112]

50.    In its complaint, Otter Tail argues that the lack of a unilateral option to initially fund network upgrades would harm Otter Tail (as an affected system operator) through the cost impact of being forced to use Option 2 customer funding.[113] This argument implies that the affected system operator is owed the interconnection customer's financing business and need not allow the interconnection customer to choose freely how to fund the costs of network upgrades for which the interconnection customer is responsible. Furthermore, as the costs for network upgrades under 345 kV in MISO are the responsibility of the interconnection customer under MISO's Interconnection Customer Funding Policy,[114] it stands to reason that the interconnection customer would have the incentive to find the lowest cost solution to funding network upgrades associated

---

[110] The amount of security provided in the FSA is theoretically reduced ratably by the depreciated portion of the network upgrade charge rate, which is also called the return of capital.

[111] Order No. 2003, FERC Stats. & Regs. ¶ 31,146 at P 1.

[112] *E.ON*, 137 FERC ¶ 61,076 at P 37 (finding that "the election of Option 1 by a transmission owner increases the costs that are directly assigned to the interconnection customer, but there is no difference in the interconnection service provided.").

[113] Otter Tail Complaint at 21.

[114] The interconnection customer may receive 10 percent reimbursement for the costs of projects that are 345 kV or above.

USCA Case #16-1075    Document #1606143    Filed: 03/29/2016    Page 31 of 70

with its interconnection requests, and therefore the transmission owner should not have control over the interconnection customer's funding decision. Additionally, Otter Tail would not be forced to use Option 2 if the option to initially fund network upgrades is allowed under mutual agreement between the transmission owner and the interconnection customer, as the option to initially fund would still be available to the transmission owner if the interconnection customer is in agreement. We are also not persuaded by Otter Tail's assertion that the possibility of an interconnection customer lacking the means to fund the network upgrades is grounds to provide the transmission owner with the unilateral right to elect the initial funding option in MISO. Otter Tail has not provided any evidence of this scenario occurring in MISO, let alone demonstrated that individual instances where that could occur warrant conferring a unilateral right to transmission owners for all generator interconnections in MISO, given interconnection customers' limited ability to receive transmission credits for funding upgrades under MISO's Interconnection Customer Funding Policy.

51.     We disagree with Otter Tail's assertion that *Hoopeston* provides support for applying the unilateral initial funding option to MISO's *pro forma* FCA. In *Hoopeston*, the Commission did not consider whether the *unilateral* aspect of the initial funding option in Article 11.3 of MISO's *pro forma* GIA was just and reasonable, and no party challenged the Tariff language. Rather, the Commission was presented for the first time with the issue of how MISO's Interconnection Customer Funding Policy should be implemented under the initial funding option, as it was written into MISO's *pro forma* GIA. The Commission implemented the existing Tariff language and found it unduly discriminatory for a transmission owner to recover costs other than the return of and on the capital costs of the network upgrades from an interconnection customer under the initial funding option, because an interconnection customer charged under Option 2 would only be required to pay for the capital costs of the network upgrades.[115]

52.     By contrast, in this complaint proceeding, Otter Tail alleges that the existing Tariff is unjust, unreasonable and unduly discriminatory and seeks to revise that Tariff under FPA section 206 to extend the unilateral initial funding election in MISO's *pro forma* GIA to MISO's *pro forma* FCA. We now consider the justness and reasonableness of the unilateral initial funding language in MISO's *pro forma* GIA, and we find that, because there is the possibility for an increase in costs presented by a transmission owner's unilateral election to provide initial funding as compared with Option 2, and yet there is no increase in interconnection service provided, such unilateral election may be contrary to *E.ON*, and may otherwise be unjust and unreasonable for the reasons discussed above.

---

[115] *Hoopeston*, 145 FERC ¶ 61,111 at P 41.

Docket No. ER14-2464-002, *et al.*                                              - 29 -

## b.  **Institution of New Proceeding**

53.     We have examined Article 11.3 of MISO's *pro forma* GIA and it appears that this provision may be unjust, unreasonable, unduly discriminatory or preferential in light of the opportunities for undue discrimination and for increasing costs where there is no increase in service, given that interconnection customers are held responsible for network upgrade costs and do not receive credits that reimburse them for those costs under MISO's Interconnection Customer Funding Policy, as discussed above.  Accordingly, we reject Otter Tail's request to revise the *pro forma* FCA to include the language that is currently available in Article 11.3 of MISO's *pro forma* GIA and institute a proceeding in Docket No. EL15-68-000, pursuant to section 206 of the FPA, to examine MISO's *pro forma* FCA, GIA, and MPFCA.  Upon initial review, we find that the potentially unjust and unreasonable Tariff language could be remedied by revising MISO's Tariff to provide that the transmission owner or affected system operator may only elect to provide the initial funding for network upgrades if the interconnection customer agrees to such election; otherwise, the interconnection customer must fund the network upgrades associated with its interconnection request through other means.  Specifically, MISO could revise Article 11.3 of its *pro forma* GIA to remove the ability for a transmission owner to unilaterally elect to initially fund network upgrades, as follows:

> Transmission Owner shall provide Transmission Provider and Interconnection Customer with written notice pursuant to Article 15 *that*~~if~~ Transmission Owner elects to fund the capital for the Network Upgrades and Transmission Owner's System Protection Facilities*, which election shall only be available upon mutual agreement of Interconnection Customer and Transmission Owner*; otherwise, such facilities, if any, shall be solely funded by Interconnection Customer.

As we have determined that the customers of an affected system operator under MISO's *pro forma* FCA or an affected system operator under MISO's *pro forma* MPFCA must be treated similarly to the customers of a directly-connected transmission owner under MISO's *pro forma* GIA, MISO would also include the initial funding language above in its *pro forma* FCA and *pro forma* MPFCA, revising as necessary to reflect the proper terminology for each *pro forma* agreement.

54.     The Commission requires MISO, within 60 days of the date of publication of notice of the Commission's initiation of Docket No. EL15-68-000, either to (1) report whether it will propose Tariff changes as suggested by the Commission, providing that the transmission owner or affected system operator may only elect to provide the initial funding for network upgrades if the interconnection customer agrees to such election, or (2) explain why such changes are not necessary to address the potential that MISO transmission owners may exercise their discretion to increase the network upgrade costs that are directly assigned to interconnection customers under MISO's Interconnection Customer Funding Policy.

55.    Assuming that the interconnection customer is agreeable to the transmission owner providing the initial funding for network upgrades, we agree with the ITC Companies that MISO's *pro forma* GIA, FCA, and MPFCA should provide an affected system operator or transmission owner with the flexibility to calculate a revenue requirement for network upgrades that is just and reasonable, and we decline to prescribe the method by which a revenue requirement for network upgrades would be calculated under the initial funding option.

56.    In cases where, as here, the Commission institutes a proceeding under section 206 of the FPA, the Commission must establish a refund effective date that is no earlier than publication of notice of the Commission's initiation of its investigation in the *Federal Register*, and no later than five months subsequent to that date.  We will establish a refund effective date at the earliest date allowed, i.e., the date the notice of the initiation of the investigation in Docket No. EL15-68-000 is published in the *Federal Register*.  The Commission is also required by section 206 to indicate when it expects to issue a final order.  The Commission expects to issue a final order in this section 206 proceeding by April 30, 2016.

## c.    Other Issues

57.    We agree with Otter Tail that its complaint in Docket No. EL15-36-000 is not barred by the doctrine of collateral estoppel, as the issue now before the Commission is not the same issue the Commission faced in the Border Winds FCA Order.  In the complaint proceeding, the issue before the Commission is whether the *pro forma* FCA is unjust and unreasonable to the extent that it does not permit an affected system operator to elect to initially fund network upgrades.  In the Border Winds FCA Order, the issue before the Commission was whether MISO had met its burden to justify the proposed non-conforming provisions of the Border Winds FCA, and the Commission specifically stated that it did not pre-judge whether it would be just and reasonable to amend MISO's *pro forma* FCA to adopt the initial funding option on a generic basis.[116]  We also agree with Otter Tail that the doctrine of *res judicata* is also inapplicable to this proceeding because Otter Tail's complaint does not seek to re-litigate the non-conforming FCA that was at issue in the Border Winds FCA Order.  Thus, we disagree with MISO's assertion that the Commission need not address the complaint because it could address the issues in the complaint on rehearing of the Border Winds FCA Order.

58.    We disagree with the contention of AWEA and WOW that the Commission must reject the complaint and require this matter to be discussed at the MISO stakeholder level.  While we encourage parties to follow the MISO stakeholder process when requesting changes to MISO's Tariff, parties have a statutory right to file complaints

---

[116] Border Winds FCA Order, 149 FERC ¶ 61,224 at P 25 n.57.

under section 206 of the FPA. Furthermore, Otter Tail has stated that it attempted to work with MISO on revising its *pro forma* FCA for years and has been unable to effectuate any changes to MISO's Tariff – therefore, we disagree that Otter Tail failed to first seek relief through the MISO stakeholder process.[117]

The Commission orders:

    (A)    The requests for rehearing of the Border Winds FCA Order filed in Docket No. ER14-2464-002 are denied, as discussed in the body of this order.

    (B)    Otter Tail's complaint filed in Docket No. EL15-36-000 is granted in part and denied in part, as discussed in the body of this order.

    (C)    Pursuant to the authority contained in and subject to the jurisdiction conferred upon the Commission by section 402(a) of the Department of Energy Organization Act and by the FPA, particularly section 206 thereof, and pursuant to the Commission's Rules of Practice and Procedure and the regulations under the FPA (18 C.F.R., Chapter I), the Commission hereby institutes a proceeding in Docket No. EL15-68-000, as discussed in the body of this order.

    (D)    MISO is hereby directed to submit a filing, within 60 days of the date of publication of notice of the Commission's initiation of Docket No. EL15-68-000, either to (1) report whether it will propose Tariff changes providing that the transmission owner or affected system operator may only elect to provide the initial funding for network upgrades if the interconnection customer agrees to such election, or (2) explain why such changes are not necessary to address the potential that MISO transmission owners may exercise their discretion to increase the network upgrade costs that are directly assigned to interconnection customers under MISO's Interconnection Customer Funding Policy.

    (E)    Any interested person desiring to be heard in Docket No. EL15-68-000 must file a notice of intervention or motion to intervene, as appropriate, with the Federal Energy Regulatory Commission, 888 First Street NE, Washington, DC 20426, in accordance with Rule 214 of the Commission's Rules of Practice and Procedure (18 C.F.R. § 385.214 (2014)) within 21 days of the date of this order.

    (F)    The Secretary shall promptly publish in the *Federal Register* a notice of the Commission's initiation of the proceeding under section 206 of the FPA in Docket No. EL15-68-000.

---

[117] Otter Tail Complaint at 22.

    (G)    The refund effective date in Docket No. EL15-68-000 established pursuant to section 206 of the FPA shall be the date of publication in the *Federal Register* of the notice discussed in Ordering Paragraph (F) above.

By the Commission.

( S E A L )

 

 

Kimberly D. Bose,
Secretary.

USCA Case #16-1075     Document #1606143         Filed: 03/29/2016     Page 36 of 70
Document Content(s)

ER14-2464-002.DOCX.......................................................1-32

153 FERC ¶ 61,352
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Norman C. Bay, Chairman;
Cheryl A. LaFleur, Tony Clark,
and Colette D. Honorable.

| | |
|---|---|
| Otter Tail Power Company | Docket Nos.    EL15-36-001 |
| v. | |
| Midcontinent Independent System Operator, Inc. | |
| Midcontinent Independent System Operator, Inc. | EL15-68-000<br>EL15-68-001 |

ORDER DENYING REHEARING AND GRANTING CLARIFICATION, AND
DIRECTING COMPLIANCE FILING

(Issued December 29, 2015)

1.     On June 18, 2015,  the Commission issued an order granting in part and
denying in part a complaint filed by Otter Tail Power Company (Otter Tail) pursuant to
sections 206 and 306 of the Federal Power Act (FPA),[1] finding that Midcontinent
Independent System Operator, Inc.'s (MISO) Open Access Transmission, Energy and
Operating Reserve Markets Tariff (Tariff) is unjust and unreasonable to the extent that
the *pro forma* Facilities Construction Agreement (FCA) and Multi-Party Facilities
Construction Agreement (MPFCA) contained therein did not permit an affected system
operator the same right to elect to provide the initial funding for network upgrades that is
given to directly-connected transmission owners under MISO's *pro forma* Generator
Interconnection Agreement (GIA).[2]  The Commission also found that MISO's *pro forma*

---

[1] 16 U.S.C. §§ 824e, 825e (2012).

[2] *Midcontinent Indep. Sys. Operator, Inc.*, 151 FERC ¶ 61,220, at PP 47, 53 (2015)
(June 18 Order).

GIA may be unjust, unreasonable, unduly discriminatory or preferential in light of the opportunities for undue discrimination and for increasing costs to interconnection customers where there is no increase in service, given that interconnection customers within MISO are held responsible for network upgrade costs and do not receive credits that reimburse them for those costs.[3]  On July 20, 2015, the Certain MISO Transmission Owners[4] filed a request for rehearing of the June 18 Order.  In this order, we deny the request for rehearing but grant clarification.

2.      In the June 18 Order, the Commission instituted a proceeding to examine MISO's *pro forma* FCA, GIA, and MPFCA pursuant to section 206 of the FPA, requiring MISO to make a filing either to (1) report whether it will propose Tariff changes discussed by the Commission, providing that the transmission owner or affected system operator may only elect to provide the initial funding for network upgrades if the interconnection customer agrees to such election, or (2) explain why such changes are not necessary to address the potential that MISO transmission owners may exercise their discretion to increase the network upgrade costs that are directly assigned to interconnection customers.[5]  On August 17, 2015, MISO made an informational filing regarding the Commission's initial funding option.  In this order, we direct MISO to make a compliance filing, due within 10 days of the date of this order, proposing Tariff changes, to be effective on June 24, 2015.

---

[3] *Id.* PP 48, 53.

[4] For the purposes of this filing the Certain MISO Transmission Owners include: Ameren Services Company, as agent for Union Electric Company d/b/a Ameren Missouri, Ameren Illinois Company d/b/a Ameren Illinois and Ameren Transmission Company of Illinois (Ameren); Central Minnesota Municipal Power Agency; Cleco Power LLC; Dairyland Power Cooperative; Duke Energy Business Services, LLC for Duke Energy Indiana, Inc.; Indiana Municipal Power Agency; Indianapolis Power & Light Company; International Transmission Company d/b/a ITC*Transmission*; ITC Midwest LLC; Michigan Electric Transmission Company, LLC; MidAmerican Energy Company; Minnesota Power (and its subsidiary Superior Water, L&P); Northern Indiana Public Service Company; Northwestern Wisconsin Electric Company; Otter Tail; and Wabash Valley Power Association, Inc.

[5] June 18 Order, 151 FERC ¶ 61,220 at P 54.

Docket No. EL15-36-001, *et al.*    - 3 -

## I.    **Background**

3.    MISO's *pro forma* GIA governs the network upgrades constructed for the interconnection customer by the transmission owner with which it directly interconnects. In October 2009, the Commission accepted MISO's proposal for cost responsibility for network upgrades as set forth in revised Attachment FF of its Tariff.[6]  As such, under the existing Tariff, an interconnection customer is responsible for 100 percent of network upgrade costs, with a possible 10 percent reimbursement for projects that are 345 kV and above.[7]  This is referred to herein as MISO's Interconnection Customer Funding Policy. At that time, MISO's Tariff provided three alternatives for funding the costs of network upgrades for generator interconnections.  Attachment FF of the Tariff described two of these alternatives (Option 1 and Option 2), which were incorporated into MISO's *pro forma* GIA by reference, while Article 11.3 in MISO's *pro forma* GIA[8] contemplated a third.

4.    Under Option 1:  (1) the interconnection customer provided up-front funding for network upgrades; (2) the transmission owner provided a 100 percent refund of the cost of network upgrades to the interconnection customer upon completion of the network upgrades; and (3) the transmission owner assessed the interconnection customer a monthly network upgrade charge to recover the cost of the non-reimbursable portion of the network upgrade costs over time based on a formula contained in Attachment GG[9] of

---

[6] Attachment FF (Transmission Planning Expansion Protocol) of the MISO Tariff describes the process to be used by MISO to develop the MISO Transmission Expansion Plan, which facilitates the expansion of and/or modification to MISO's transmission system.

[7] *Midwest Indep. Transmission Sys. Operator, Inc.*, 129 FERC ¶ 61,060, at P 8 (2009).  The Commission allows flexibility as to the specifics of interconnection pricing policies for transmission providers that are independent entities, and MISO's proposal was accepted by the Commission as an independent entity variation from the Commission-approved *pro forma* Large Generator Interconnection Agreement (LGIA). *Id*. P 50.

[8] MISO's *pro forma* GIA is located in Appendix 6 to Attachment X of the MISO Tariff (Generator Interconnection Procedures).

[9] Attachment GG (Network Upgrade Charge) of the MISO Tariff includes in the calculation of the network upgrade charge a return on capital investment, income taxes, depreciation expense, operating and maintenance expense (O&M), administrative and general expense, and other direct and indirect costs.

Docket No. EL15-36-001, *et al.*                                      - 4 -

the MISO Tariff. The charge was established through a separate facilities service agreement.

5.    Under Option 2: (1) the interconnection customer provides up-front funding for network upgrades and (2) the transmission owner refunds the reimbursable portion of the payment, as applicable, to the interconnection customer in the form of a credit to reduce the transmission service charges incurred by the transmission customer with no further financial obligations on the interconnection customer for the cost of upgrades.

6.    Under a third alternative set forth in Article 11.3 of MISO's *pro forma* GIA, the transmission owner can unilaterally elect to provide the up-front funding for the capital cost of the network upgrades.[10]   MISO's existing *pro forma* GIA at Article 11.3 reads as follows:

> Transmission Owner shall provide Transmission Provider and Interconnection Customer with written notice pursuant to Article 15 if Transmission Owner elects to fund the capital for the Network Upgrades and Transmission Owner's System Protection Facilities; otherwise, such facilities, if any, shall be solely funded by Interconnection Customer.

The transmission owner could unilaterally elect any of the three options to fund the costs of network upgrades for generator interconnections.

---

[10] This option was originally identified in Order No. 2003. *See Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, FERC Stats. & Regs. ¶ 31,146, at P 720 (2003), *order on reh'g*, Order No. 2003-A, FERC Stats. & Regs. ¶ 31,160, at PP 618, 658, *order on reh'g*, Order No. 2003-B, FERC Stats. & Regs. ¶ 31,171 (2004), *order on reh'g*, Order No. 2003-C, FERC Stats. & Regs. ¶ 31,190 (2005), *aff'd sub nom. Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007), *cert. denied*, 552 U.S. 1230 (2008). The option in the *pro forma* LGIA established by Order No. 2003 differs from the option in MISO's Tariff. Specifically, under Article 11.3 of the Order No. 2003 *pro forma* LGIA, a transmission owner electing to initially fund network upgrades would provide the up-front funding for the capital cost of the network upgrades, and then recover the costs of the network upgrades through its transmission rates charged to *all* transmission customers. In contrast, in MISO, a transmission owner electing to initially fund network upgrades would assign the non-reimbursable portion of the costs of the network upgrades directly to the interconnection customer through a network upgrade charge.

7.      On October 20, 2011, the Commission responded to a complaint filed in March 2011 by ordering the removal of Option 1 from MISO's Attachment FF, finding that this option increased the costs directly assigned to the interconnection customer with no corresponding increase in service compared to other funding options.[11]  The Commission found that it was unjust and unreasonable to require an interconnection customer to provide up-front funding for network upgrades and then permit the transmission owner to repay the amount and charge the interconnection customer for the transmission owner's capital costs and income tax allowance.[12]  The Commission also found that leaving the election of Option 1 to the sole discretion of a transmission owner "creates unacceptable opportunities for undue discrimination by affording a transmission owner the discretion to increase the costs of interconnection service by assigning both increased capital costs, as well as non-capital costs . . . to particular interconnecting generators, but not others."[13]  The Commission noted that a third option (described below) was still available under MISO's *pro forma* GIA as an alternative to Option 2.[14]

8.      In 2013, the Commission was presented for the first time with MISO's implementation of the transmission owner's election under Article 11.3 of MISO's *pro forma* GIA to initially fund network upgrades whose costs are directly assigned to the interconnecting customer under MISO's Interconnection Customer Funding Policy.[15]  In *Hoopeston*, the Commission found that it is just and reasonable and not unduly discriminatory for the transmission owner electing to initially fund network upgrades under MISO's *pro forma* GIA to recover the capital costs for network upgrades through a network upgrade charge assessed to the interconnection customer, established using the formula in Attachment GG and consistent with MISO's Interconnection Customer Funding Policy.[16]  However, consistent with its findings in *E.ON*, the Commission found

---

[11] *E.ON Climate & Renewables North America, LLC v. Midwest Indep. Transmission Sys. Operator, Inc.*, 137 FERC ¶ 61,076, at P 37 (2011) (*E.ON*), *order on reh'g*, 142 FERC ¶ 61,048, at P 21 (2013) (*E.ON Rehearing Order*).

[12] *E.ON*, 137 FERC ¶ 61,076 at P 37.

[13] *Id.* P 38.

[14] *Id.* P 37.

[15] *Midcontinent Indep. Sys. Operator, Inc.*, 145 FERC ¶ 61,111 (2013) (*Hoopeston*), *aff'd on reh'g*, 149 FERC ¶ 61,099 (2014) (*Hoopeston Rehearing*).

[16] *Hoopeston*, 145 FERC ¶ 61,111 at P 41.

20151229-3054 FERC PDF (Unofficial) 12/29/2015
Docket No. EL15-36-001, *et al.*                                    - 6 -

that it is unduly discriminatory for a transmission owner to recover costs other than the
return of and on the capital costs of the network upgrades (such as O&M, taxes other than
income taxes, and general and common plant costs) from an interconnection customer
under this option, because an interconnection customer charged under Option 2 would
only be required to pay for the capital costs of the network upgrades.  Therefore, the
Commission directed MISO to revise the GIA at issue in that case so that the network
upgrade charge does not include the recovery of costs other than the return of and on the
capital costs of the network upgrades.[17]

9.      In addition to MISO's *pro forma* GIA, the Commission has also accepted MISO's
*pro forma* FCA and *pro forma* MPFCA.[18]  The *pro forma* FCA is an agreement for
network upgrades on affected systems, or network upgrades constructed for an
interconnection customer by a transmission owner other than the transmission owner with
which it directly interconnects.  This indirectly-connected transmission owner is known
as the affected system operator under the FCA.  The *pro forma* MPFCA is used when
multiple interconnection requests cause the need for construction of common network
upgrades (upgrades that are constructed by a transmission owner for more than one
interconnection customer) on a directly-connected transmission system or the
transmission system of an affected system operator.  The *pro forma* FCA and *pro forma*
MPFCA are appendices to MISO's generator interconnection procedures and, as with the
*pro forma* GIA, these agreements reference MISO's Interconnection Customer Funding
Policy and the network upgrade cost recovery provisions in Attachment FF of MISO's
Tariff.  However, the *pro forma* FCA and the *pro forma* MPFCA do not include the
unilateral initial funding option contained in Article 11.3 of MISO's *pro forma* GIA.

10.     On July 18, 2014, as amended on October 14, 2014, MISO submitted for filing
an unexecuted non-conforming FCA among Border Winds Energy, LLC (Border Winds)
as interconnection customer, Otter Tail as transmission owner, and MISO as transmission
provider (Border Winds FCA).  MISO stated that the unexecuted Border Winds FCA
generally conformed to the *pro forma* FCA, with the exception of non-conforming
language in section 3.2.1 that provided Otter Tail (as the affected system operator)

---

[17] Thus, in *Hoopeston*, the Commission sought to make the types of costs to be
recovered pursuant to Article 11.3, when the transmission owner elects to initially fund
the network upgrades, comparable with the costs recovered under Option 2.

[18] *Midwest Indep. Transmission Sys. Operator, Inc.*, 129 FERC ¶ 61,301, at P 5
(2009).

Docket No. EL15-36-001, *et al.*                                                          - 7 -

with the option to elect to provide the initial funding for the network upgrades.[19]  On December 12, 2014, the Commission conditionally accepted the unexecuted Border Winds FCA, to become effective July 19, 2014, as requested, subject to removal of the non-conforming language that would have provided Otter Tail the unilateral right to elect to initially fund the network upgrades and subsequently assess a network upgrade charge.[20]  The Commission's reasoning for the removal of the non-conforming language was that MISO did not assert any specific reliability concerns, novel legal issues, or other unique factors to justify the proposed non-conforming provisions to the Border Winds FCA.[21]  MISO and Otter Tail filed requests for rehearing of the Border Winds FCA Order in Docket No. ER14-2464-002.

11.     On January 12, 2015, Otter Tail filed a complaint, pursuant to sections 206 and 306 of the FPA,[22] alleging that MISO's Tariff is unjust and unreasonable to the extent that the *pro forma* FCA contained therein does not permit an affected system operator to elect to provide the initial funding for network upgrades, a right which is provided to directly-connected transmission owners under MISO's *pro forma* GIA.[23]  Otter Tail argued that there is no technical or engineering reason to treat network upgrades made in response to direct generator interconnections any differently than network upgrades made in response to indirect impacts from generator interconnections.[24]  Otter Tail stated that, when funding and constructing network upgrades to facilitate the integration of new generation sources to its transmission system, regardless of whether a generator directly or indirectly connects with the transmission system, Otter Tail must conduct the same facilities studies, complete similar engineering and procurement tasks, and pay for similar services and materials.[25]  Otter Tail requested that the Commission direct MISO to revise

---

[19] MISO Border Winds FCA Filing, Docket No. ER14-2464-000, Transmittal Letter, at 2 (filed July 18, 2014).

[20] *Midcontinent Indep. Sys. Operator, Inc*., 149 FERC ¶ 61,224, at PP 1, 22 (2014) (Border Winds FCA Order).

[21] *Id.* P 25.

[22] 16 U.S.C. §§ 824e, 825e (2012).

[23] Otter Tail Complaint and Request for Fast-Track Processing, Docket No. EL15-36-000, at 1 (filed Jan. 12, 2015).

[24] *Id.* at 14.

[25] *Id.* at 15.

the Tariff to include a provision in the *pro forma* FCA that permits an affected system operator to elect to initially fund network upgrades.

12.    Otter Tail argued that its position was supported by *Hoopeston*, where the Commission determined that it is just and reasonable for a transmission owner under a GIA to elect to initially fund necessary network upgrades and recover from the interconnection customer a return of and on the capital costs of the network upgrades.[26] Otter Tail stated that the Commission noted in *Hoopeston* that the transmission owner's decision to initially fund network upgrades was consistent with Orders Nos. 2003 and 2003-A.[27]

13.    In the June 18 Order, the Commission denied rehearing of the Border Winds FCA Order.[28]  The Commission affirmed its finding that a transmission provider seeking Commission acceptance of a non-conforming agreement bears a high burden to justify and explain that the non-conforming aspects of the agreement are necessary, and that MISO did not assert any specific reliability concerns, novel legal issues, or other unique factors to justify the proposed non-conforming provisions in the Border Winds FCA.[29]

14.    In the June 18 Order, the Commission also granted Otter Tail's complaint in part, finding that the customers of an affected system operator under MISO's *pro forma* FCA or MPFCA and the customers of a directly-connected transmission owner under MISO's *pro forma* GIA are similarly situated, and that the comparability principle requires similarly situated customers to be treated comparably in the transmission system planning context.[30]  However, the Commission denied Otter Tail's complaint in part because it disagreed with Otter Tail that the *pro forma* FCA should adopt the language in Article 11.3 of MISO's *pro forma* GIA, which allowed the transmission owner to unilaterally elect to provide the initial funding for network upgrades.[31]  The Commission found that Article 11.3 of MISO's *pro forma* GIA may be unjust, unreasonable, unduly

---

[26] *Id.* at 13 (citing *Hoopeston*, 145 FERC ¶ 61,111 at P 41).

[27] *Id.* (citing Order No. 2003-A, FERC Stats. & Regs. ¶ 31,160 at P 720).

[28] June 18 Order, 151 FERC ¶ 61,220 at P 22.

[29] *Id.* PP 22, 23.

[30] *Id.* P 47.

[31] *Id.* P 48.

Docket No. EL15-36-001, *et al.*                                          - 9 -

discriminatory or preferential because it allows the transmission owner the discretion to elect to initially fund the upgrades and subsequently assess the interconnection customer a network upgrade charge that is not later reimbursed to the interconnection customer through the provision of credits, which may result in discriminatory treatment by the transmission owner of different interconnection customers.  The Commission additionally found that, by *unilaterally* electing to initially fund network upgrades where the interconnection customer is held responsible for such costs and does not receive credits to reimburse it for those costs, pursuant to MISO's Interconnection Customer Funding Policy, the affected system operator or transmission owner may deprive the interconnection customer of other options to finance the cost of the network upgrades that provide more favorable terms and rates.  For instance, the Commission found that the transmission owner's unilateral election to initially fund network upgrades may increase costs of interconnection service by assigning increased capital costs and a security requirement to the interconnection customer with no corresponding increase in service, a situation that shared similar characteristics to those of Option 1, which the Commission eliminated in *E.ON*.[32]

15.     The Commission also disagreed with Otter Tail's assertion that *Hoopeston* provides support for applying the unilateral initial funding option to MISO's *pro forma* FCA.[33]  The Commission noted that *Hoopeston* did not consider whether the *unilateral* aspect of the initial funding option in Article 11.3 of MISO's *pro forma* GIA was just and reasonable; rather, the Commission was presented for the first time with the issue of how MISO's Interconnection Customer Funding Policy should be implemented under the initial funding option, as it was written into MISO's *pro forma* GIA.  The Commission stated that *Hoopeston* implemented the existing Tariff language and found it unduly discriminatory for a transmission owner to recover costs other than the return of and on the capital costs of the network upgrades from an interconnection customer under the initial funding option, because an interconnection customer charged under Option 2 would only be required to pay for the capital costs of the network upgrades.[34]  By contrast, in the complaint proceeding, the Commission stated that it considered the

---

[32] *Id.* P 49 (citing *E.ON*, 137 FERC ¶ 61,076 at P 37 (finding that "the election of Option 1 by a transmission owner increases the costs that are directly assigned to the interconnection customer, but there is no difference in the interconnection service provided.")).

[33] *Id.* P 51.

[34] *Hoopeston*, 145 FERC ¶ 61,111 at P 41.

justness and reasonableness of the unilateral initial funding language in MISO's *pro forma* GIA and found that, because there is the possibility for an increase in costs presented by a transmission owner's unilateral election to provide initial funding as compared with Option 2, and yet there is no increase in interconnection service provided, such unilateral election may be contrary to *E.ON*, and may otherwise be unjust and unreasonable.

16.     Given its determination that Article 11.3 of MISO's *pro forma* GIA may be unjust, unreasonable, unduly discriminatory or preferential in light of the opportunities for undue discrimination and for increasing costs where there is no increase in service, the Commission instituted a proceeding in Docket No. EL15-68-000, pursuant to section 206 of the FPA, to examine MISO's *pro forma* FCA, GIA, and MPFCA.[35]  The Commission required MISO to either:  (1) report whether it will propose Tariff changes to revise Article 11.3 of its *pro forma* GIA to remove the ability for a transmission owner to unilaterally elect to initially fund network upgrades and include the same initial funding language in its *pro forma* FCA and *pro forma* MPFCA; or (2) explain why such changes are not necessary to address the potential that MISO transmission owners may exercise their discretion to increase the network upgrade costs that are directly assigned to interconnection customers under MISO's Interconnection Customer Funding Policy.[36]  The Commission also ordered that any interested person desiring to be heard in Docket No. EL15-68-000 must file a notice of intervention or motion to intervene, as appropriate, within 21 days of the date of the order.[37]  Additionally, the Commission established a refund effective date of June 24, 2015, the date the notice of the initiation of the investigation in Docket No. EL15-68-000 was published in the *Federal Register*.[38]

## II.     Notices, MISO's Filing, and Responsive Pleadings

17.     On June 24, 2015, a notice of the institution of a proceeding under section 206 of the FPA to investigate the justness and reasonableness of MISO's *pro forma* FCA, GIA, and MPFCA was published in the *Federal Register*, 80 Fed. Reg. 36,333 (2015).  The

---

[35] June 18 Order, 151 FERC ¶ 61,220 at P 53.

[36] *Id.* PP 53-54.

[37] *Id.* at ordering para. E.

[38] *Id.* P 56.  *See also* 80 Fed. Reg. 36,333-334 (2015) (publication of notice in *Federal Register*).

notice indicated that the refund effective date will be the date of publication of the notice in the *Federal Register*.

18.     Timely motions to intervene in Docket No. EL15-68-000 were filed by:  Iberdrola Renewables, LLC; the Wisconsin Public Service Corporation; EDF Renewable Energy, Inc.; E.ON Climate & Renewables North America LLC; the American Wind Energy Association (AWEA) and Wind on the Wires; Great River Energy; NextEra Energy Resources, LLC; the MISO Transmission Owners;[39] Hoopeston Wind, LLC (Hoopeston); Wisconsin Electric Power Company; Edison Electric Institute; Ameren and Otter Tail; and Consumers Energy Company.  Alliant Energy Corporate Services, Inc. (Alliant) and the American Electric Power Service Corporation filed motions to intervene out-of-time.

19.     On July 20, 2015, the Certain MISO Transmission Owners filed a request for rehearing of the June 18 Order.

---

[39] The MISO Transmission Owners for this filing consist of:  Ameren; American Transmission Company LLC; Arkansas Electric Cooperative Corporation; Big Rivers Electric Corporation; Central Minnesota Municipal Power Agency; City Water, Light & Power (Springfield, IL); Cleco Power LLC; Dairyland Power Cooperative; Duke Energy Business Services, LLC for Duke Energy Indiana, Inc.; East Texas Electric Cooperative; Entergy Arkansas, Inc.; Entergy Louisiana, LLC; Entergy Gulf States Louisiana, L.L.C.; Entergy Mississippi, Inc.; Entergy New Orleans, Inc.; Entergy Texas, Inc.; Hoosier Energy Rural Electric Cooperative, Inc.; Indiana Municipal Power Agency; Indianapolis Power & Light Company; International Transmission Company d/b/a ITCTransmission; ITC Midwest LLC; Michigan Electric Transmission Company, LLC; Michigan Public Power Agency; MidAmerican Energy Company; Minnesota Power (and its subsidiary Superior Water, L&P); Montana-Dakota Utilities Co.; Northern Indiana Public Service Company; Northern States Power Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.; Northwestern Wisconsin Electric Company; Otter Tail Power Company; Prairie Power Inc.; South Mississippi Electric Power Association; Southern Illinois Power Cooperative; Southern Indiana Gas & Electric Company (d/b/a Vectren Energy Delivery of Indiana); Southern Minnesota Municipal Power Agency; Wabash Valley Power Association, Inc.; and Wolverine Power Supply Cooperative, Inc.

20.     On August 17, 2015, in Docket No. EL15-68-000, *et al.*, MISO filed an "informational report" regarding the initial funding mechanism in MISO's *pro forma* GIA.[40]  On September 15, 2015, notice of the MISO Report was published in the *Federal Register*, 80 Fed. Reg. 55,351 (2015), with comments due on or before September 30, 2015.  The notice stated that the Commission was providing an opportunity for other parties to comment on the Commission's preliminary findings in the section 206 proceeding in Docket No. EL15-68-000, as well as the MISO Report.  Timely comments were filed by:  Ameren and Otter Tail;[41] the Indicated Transmission Owners;[42] AWEA; Alliant; and Hoopeston.

21.     On July 29, 2015, AWEA filed reply comments to the comments submitted by Ameren and Otter Tail on July 9, 2015, in Docket No. EL15-68-000.

22.     On October 15, 2015, Ameren filed a motion for leave to answer and answer to Hoopeston's comments.  On October 15, 2015, the Indicated Transmission Owners filed a motion for leave to answer and answer to AWEA's comments.  On October 30, 2015, AWEA filed a motion for leave to answer and answer to the Indicated Transmission Owners' answer.  On October 30, 2015, Hoopeston filed a motion for leave to answer and answer to Ameren's answer.

## III.    Discussion

### A.    Procedural Matters

23.     Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2015), the timely, unopposed motions to intervene in Docket No. EL15-68-000 serve to make the entities that filed them parties to this proceeding. Pursuant to Rule 214(d) of the Commission's Rules of Practice and Procedure,

---

[40] MISO Commission Proposed Language Informational Report, Docket Nos. ER14-2464-002 *et al.* (filed Aug. 17, 2015) (MISO Report).

[41] Ameren and Otter Tail filed their comments on July 9, 2015, in response to the publication of the June 18 Order.

[42] For the purposes of this proceeding, the Indicated Transmission Owners consist of:  Ameren; Northern Indiana Public Service Company; Otter Tail; International Transmission Company d/b/a ITCTransmission; Michigan Electric Transmission Company, LLC; ITC Midwest LLC; Indianapolis Power & Light Company; and MidAmerican Energy Company.

18 C.F.R. § 385.214(d) (2015), the Commission will grant the late-filed motions to intervene of Alliant and the American Electric Power Service Corporation given their interests in the proceeding, the early stage of the proceeding, and the absence of undue prejudice or delay.

24.     Rule 213(a)(2) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213(a)(2) (2015), prohibits an answer to a protest or answer unless otherwise ordered by the decisional authority.  We are not persuaded to accept the October 15, 2015 answers of Ameren and the Indicated Transmission Owners and the October 30, 2015 answers of AWEA and Hoopeston, and therefore reject them.

### B.     Substantive Matters

### 1.     Request for Rehearing of the June 18 Order

#### a.     Request for Rehearing

25.     The Certain MISO Transmission Owners state that the Commission failed to explain why removal of the initial funding option is necessary when its removal can impose costs on transmission owners by depriving them of the ability to fund network upgrade costs up front and recover a return of and return on such investment from the interconnection customer.[43]  They further state that the Commission fails to address why other avenues of relief are inadequate to protect the interconnection customer if it feels the initial funding option was elected improperly, such as MISO's dispute resolution procedures or filing a complaint under section 206 of the FPA.

26.     The Certain MISO Transmission Owners argue that the Commission erred by failing to explain its departure from Order No. 2003 and *Hoopeston*, where the Commission made clear that a transmission owner has the right to unilaterally elect to initially fund network upgrades.[44]  They state that the *pro forma* LGIA established by Order No. 2003 and MISO's *pro forma* GIA are virtually identical, and nothing in the *pro forma* Order No. 2003 LGIA requires a transmission provider to obtain the

---

[43] Request for Rehearing of the Certain MISO Transmission Owners, Docket Nos. EL15-36-001 and EL15-68-001, at 16 (filed July 20, 2015) (the Certain MISO Transmission Owners Request for Rehearing).

[44] *Id* at 8-10 (citing Order No. 2003, FERC Stats. & Regs. ¶ 31,146 at P 676) ("Network Upgrades…would be funded initially by the Interconnection Customer unless the Transmission Provider elects to fund them")).

Docket No. EL15-36-001, *et al.*                                                    - 14 -

interconnection customer's consent prior to electing to fund the capital for network upgrades.[45]  They argue that the Commission erroneously distinguished *Hoopeston* when it asserted that, in that case, the Commission did not consider whether the unilateral aspect of the initial funding option in Article 11.3 of MISO's GIA was just and reasonable, and that no party challenged the Tariff language.[46]  They point to Hoopeston's protest in that proceeding, where Hoopeston (the interconnection customer) protested Ameren's election to initially fund certain network upgrades under an unexecuted GIA, arguing that the initial funding provision violated *E.ON* because there the Commission held that it was unjust, unreasonable, unduly discriminatory, and contrary to Order No. 2003 for a transmission owner to have the sole discretion to unreasonably increase the interconnection customer's costs.[47]  The Certain MISO Transmission Owners state that the Commission in *Hoopeston* recognized that these arguments had been made and found that, with the exclusion of certain costs from the charges that the interconnection customer would pay, it was appropriate for a transmission owner to elect to initially fund network upgrades.[48]  Thus, the Certain MISO Transmission Owners conclude that the issue of a transmission owner's right to elect the initial funding option was directly before the Commission in *Hoopeston*, and the Commission in the instant case did not justify its departure from the prior approval of the initial funding option.[49]

27.    The Certain MISO Transmission Owners further assert that the Commission in *Hoopeston* determined that limiting cost recovery to the return of and on capital costs is sufficient to address the potential for unreasonable imposition of costs arising from a transmission owner's decision to elect the initial funding option in Article 11.3 of MISO's GIA.[50]  They state that the Commission in the June 18 Order provided no reason why the Commission's finding in *Hoopeston* is no longer valid.

---

[45] *Id.* at 9.

[46] *Id.* at 11 (citing June 18 Order, 151 FERC ¶ 61,220 at P 51).

[47] *Id.* (citing Motion to Intervene and Protest of Hoopeston Wind, LLC, Docket No. ER13-2157-000, at 2 (filed Sept. 3, 2013)).

[48] *Id.* at 12 (citing *Hoopeston*, 145 FERC ¶ 61,111 at P 42).

[49] *Id.* at 11-12.

[50] *Id.* at 12-13 (citing *Hoopeston*, 145 FERC ¶ 61,111 at P 42).

28.     The Certain MISO Transmission Owners argue that the Commission's findings in the June 18 Order lack any evidentiary or record support, and are therefore not reasoned decision-making.[51]  They state that the Commission sought to restrict the initial funding option based on the possibility for an increase in costs to the interconnection customer without an attendant increase in service, but that nothing in the record supports that conclusion or points to any exercise of the initial funding option that shows actual unduly discriminatory treatment.[52]

### b.     Commission Determination

29.     We deny the request for rehearing of the June 18 Order.  We affirm the finding in the June 18 Order that, under MISO's Interconnection Customer Funding Policy, allowing the transmission owner to unilaterally elect the initial funding option would improperly impose costs on interconnection customers.  By unilaterally electing to initially fund network upgrades where the interconnection customer is held responsible for such costs and does not receive credits to reimburse it for those costs, pursuant to MISO's Interconnection Customer Funding Policy, the transmission owner may deprive the interconnection customer of other options to finance the cost of the network upgrades that provide more favorable terms and rates.  Thus, allowing the transmission owner to charge more for upgrade costs than the interconnection customer may have incurred on its own may result in unjust and unreasonable rates.  In addition, the unilateral election to initially fund network upgrades in MISO's *pro forma* GIA also triggers the requirement for the interconnection customer to post security on the full cost of the network upgrades over the term of the facilities service agreement which is an additional charge over that required under Option 2.[53]  In this way, Otter Tail's proposed funding is similar to Option 1 pricing.

30.     We reject the claim by the Certain MISO Transmission Owners that the Commission in the June 18 Order failed to explain its departure from prior precedent. We reject the argument that the removal of the transmission owner's unilateral election to initially fund network upgrades is contrary to Order No. 2003 and *the pro forma* LGIA

---

[51] *Id.* at 14.

[52] *Id.* at 15.

[53] Under Option 2, the interconnection customer posts security during construction of the project.  Under the transmission owner's initial funding option, the interconnection customer posts security during construction of the project and over the term of the facilities service agreement.

established therein.  The Commission recognized that the initial funding option under Article 11.3 of the Order No. 2003 *pro forma* LGIA works differently than the initial funding option under MISO's *pro forma* GIA because of MISO's Interconnection Customer Funding Policy, and the Commission repeatedly held that the unilateral option to initially fund network upgrades in MISO was unjust and unreasonable in the context of MISO's Interconnection Customer Funding Policy.[54]  Specifically, under Order Nos. 2003 and 2003-A, the interconnection customer is reimbursed for any network upgrade payments it made through transmission credits, and the non-independent transmission owner recovers the costs of the network upgrades through its transmission rates charged to *all* transmission customers.  In contrast, in MISO, an interconnection customer is responsible for 100 percent of network upgrade costs, with a possible 10 percent reimbursement for projects that are 345 kV and above.  A transmission owner electing to initially fund network upgrades would assign the non-reimbursable portion of the costs of the network upgrades directly to the interconnection customer through a network upgrade charge.  We affirm the finding in the June 18 Order that the unilateral election to initially fund network upgrades (where the interconnection customer is held responsible for such costs and does not receive credits to reimburse it for those costs, pursuant to MISO's Interconnection Customer Funding Policy), may increase costs of interconnection service by assigning increased capital costs and a security requirement to the interconnection customer with no corresponding increase in service.[55]

31.     We reject the Certain MISO Transmission Owners' argument that the transmission owner's unilateral right to elect the initial funding option was directly before the Commission in *Hoopeston*, and the Commission in that case confirmed that it is appropriate for transmission owners to have the unilateral option to initially fund network upgrades.  The Certain MISO Transmission Owners' argument is based on a misinterpretation of *Hoopeston*.  In that proceeding, the Commission was implementing the initial funding option in the existing provisions of Article 11.3 of MISO's Tariff; the Commission was not considering whether the initial funding option itself, including the unilateral aspect of it, is unjust and unreasonable.

32.     We affirm the finding in the June 18 Order that the Commission in *Hoopeston* implemented the existing Tariff language of Article 11.3 of MISO's *pro forma* GIA when it found that that the initial funding option would be not be unduly discriminatory compared to Option 2 after MISO revised the GIA to remove the recovery of costs other than the return of and on the capital costs of network upgrades.  However, we clarify the

---

[54] June 18 Order, 151 FERC ¶ 61,220 at P 6 n.8, PP 48-52.

[55] *Id.* P 49.

statement in the June 18 Order that the Commission in *Hoopeston* did not consider the effect of allowing the transmission owner to unilaterally elect the initial funding option.[56] The Commission agreed with Hoopeston that it would be unduly discriminatory to give a transmission owner the discretion to unreasonably increase an interconnection customer's costs by choosing the initial funding option as opposed to Option 2, but reasoned based on the record in that case that removal of costs other than the return of and on the capital costs of the network upgrades addressed this concern.[57]  By contrast, the Commission considered for the first time in the June 18 Order the justness and reasonableness of the unilateral aspect of the initial funding language in MISO's *pro forma* GIA where evidence was provided that the proposed recovery of capital costs and security increased costs to the interconnection customer with no corresponding increase in service.  We affirm the finding that, because there is the possibility for an increase in costs presented by a transmission owner's unilateral election to provide initial funding as compared with Option 2, and yet there is no increase in interconnection service provided, such unilateral election is unjust and unreasonable.[58]

33.     We reject the Certain MISO Transmission Owners' claim that there is no record evidence to support the Commission's decision in the June 18 Order that the transmission owner's unilateral election to initially fund network upgrades could result in increased costs to interconnection customers or be implemented in an unduly discriminatory manner.  The Border Winds protest of the unexecuted Border Winds FCA submitted in Docket No. ER14-2464-000 (Border Winds FCA Proceeding) provided record evidence that Otter Tail's election to initially fund the network upgrades increased the costs to Border Winds as the interconnection customer.  Specifically, Border Winds compared the net present value of its own cost of capital to the net present value of Otter Tail's cost of capital, calculated using the formula in Attachment GG, as allowed under *Hoopeston*.[59] Border Winds stated that, at Otter Tail's proposed fixed rate of 15.8 percent applied over a 20-year term, Border Winds' approximately $3.9 million in network upgrades would result in total costs of nearly $6.6 million.  However, if Border Winds were applying its own cost of capital to the network upgrades under Option 2 funding, Border Winds stated that it would save over $1.8 million as compared to Otter Tail electing the initial funding

---

[56] June 18 Order, 151 FERC ¶ 61,220 at P 51.

[57] *Hoopeston,* 145 FERC ¶ 61,111 at P 41.

[58] *Id.* P 52.

[59] Motion to Intervene and Protest of Border Winds Energy, LLC, Docket No. ER14-2464-000, at 5 (filed Aug. 8, 2014).

option.[60]  We recognize that Otter Tail's proposed fixed rate was not calculated in conformity with the Commission's clarification in the *Hoopeston Rehearing* order.[61]  Nevertheless, Border Winds did not provide comments in the Border Winds FCA Proceeding that to the extent a lower Otter Tail fixed charge rate would result from applying the *Hoopeston Rehearing* order clarification to the Otter Tail fixed charge rate, it would not still represent an increase in cost compared to Border Winds' capital costs. Therefore, the case record in Border Winds provided evidence that, under the unilateral election of the initial funding option by a transmission owner, a transmission owner's cost on capital could significantly increase costs to an interconnection customer relative to the interconnection customer's cost on capital under Option 2.

34.    We reject the Certain MISO Transmission Owners' argument that the Commission in the June 18 Order did not explain its departure from the determination in *Hoopeston* that limiting cost recovery to the return of and on capital costs is sufficient to address the potential for the unreasonable imposition of increased costs on the interconnection customer under the initial funding option as compared to Option 2.[62]  As stated above, the Commission in *Hoopeston* considered only the types of costs (i.e., capital versus non-capital costs) that should be properly included in the cost recovery mechanism proposed by Ameren under the initial funding option; it did not consider the effect that the transmission owner's unilateral election of the initial funding option would have on the relative capital costs (the transmission owner's versus the interconnection customer's). The Commission in *Hoopeston* stated "that it *would* be unduly discriminatory to give a transmission owner the discretion to unreasonably increase an interconnection customer's

---

[60] *Id*.  Border Winds further explained that the "comparison includes the cost to Border Winds of maintaining a letter of credit at 1.5 percent over 20 years.  With that cost excluded, customer-funding still results in over $1 million in savings to Border Winds."  *Id*. n.10.

[61] *Hoopeston Rehearing,* 149 FERC ¶ 61,099 at P 20 ("However, we clarify that the rate base to which the rate of return is applied (in the development of the Return and Income Tax Annual Allocation Factors) should include net transmission plant in service, adjusted for accumulated deferred income taxes and investment tax credits allocable to transmission plant, and should not include other elements such as construction work in progress, working capital, land held for future use or allocations of common, general, or intangible plant.").

[62] *Hoopeston*, 145 FERC ¶ 61,111 at PP 41, 42.

costs by choosing the initial fund option as opposed to Option 2."[63]  So, the Commission limited the transmission owners to the recovery of and on capital costs "because an interconnection customer charged under Option 2 would only be required to pay for the capital costs of the network upgrades."[64]  Thus, the Commission in *Hoopeston* determined that it would be just and reasonable for a transmission owner to recover a return on and of capital under the initial funding option based on the record before it in that proceeding, which lacked any comparison of capital costs or any claim that a transmission owner's cost of capital would increase costs to the interconnection customer relative to Option 2.  The Hoopeston protest argued that the net present value of the payments that Hoopeston would have to make to Ameren under Ameren's proposed Attachment GG initial funding pricing policy would increase costs to Hoopeston by $4.15 million, or 49.7 percent, relative to the total nominal cost of all of the network upgrades under the Hoopeston GIA.[65]  Hoopeston did not compare capital costs between Hoopeston and Ameren, but instead compared the net present value of a full Attachment GG network upgrade charge to the nominal base cost of capital that Hoopeston would pay under Option 2.  In contrast, in the June 18 Order, the Commission had record evidence from the Border Winds protest that the unilateral election of the initial funding option by Otter Tail would significantly increase the capital costs of network upgrade costs assessed to Border Winds relative to Border Winds' cost of capital under Option 2.

35.     We reject the Certain MISO Transmission Owners' assertion that the Commission failed to address why other avenues of relief are inadequate to protect the interconnection customer if it feels the initial funding option was elected improperly, such as MISO's dispute resolution procedures or filing a complaint under section 206 of the FPA.  These other avenues of relief do not have any bearing on the Commission's authority to institute a proceeding under section 206 of the FPA here where it perceives that a Tariff provision is unjust, unreasonable, unduly discriminatory, or preferential.[66]

---

[63] *Id*. P 41 (emphasis added).

[64] *Id*.

[65] Hoopeston Protest at 21-22.

[66] *See E.ON*, 137 FERC ¶ 61,076 at P 38 (citing to Order No. 2003, FERC Stats. & Regs. ¶ 31,146 at P 696 ("The Commission remains concerned that, when the Transmission Provider is not independent and has an interest in frustrating rival generators, the implementation of participant funding, including the 'but for' pricing approach, creates opportunities for undue discrimination . . . [A] number of aspects of the

(continued...)

Docket No. EL15-36-001, *et al.*                                              - 20 -

## 2.    **MISO's Report**

36.    In the MISO Report, MISO states that it will propose the Tariff changes the Commission discussed in the June 18 Order when the Commission addresses the comments, protests, and request for rehearing filed in the related dockets.[67]  MISO states that it has heard concerns from some transmission owners echoing the concerns in the filings, and believes that the Commission is the appropriate authority to address these concerns.

### a.    **Transmission Owner Comments**

37.    Ameren and Otter Tail argue that the June 18 Order effectively limits transmission owners to Option 2 funding, under which the generator makes an up-front cash payment for the capital costs of network upgrades, and has no further payment obligation.[68]  They argue that this limitation leaves a transmission owner with no ability to recover from the interconnection customer its other costs of service, including a return on transmission plant in service, and gives the interconnection customer a choice to avoid paying a compensatory rate.[69]  In addition, they argue that a proliferation of Option 2 funded network upgrades would place the costs of operating and maintaining the entire transmission system on zonal transmission customers, even though many transmission upgrades were built solely for generators.  Ameren and Otter Tail state that providing Option 2 funding as the sole means of recovering network upgrade costs requires the load using the transmission system to subsidize interconnecting generators.

---

'but for' approach are subjective, and a Transmission Provider that is not an independent entity has the ability and incentive to exploit this subjectivity to its own advantage.  For example, such a Transmission Provider has an incentive to find that a disproportionate share of the costs of expansions needed to serve its own customers is attributable to competing Interconnection Customers.  The Commission would find *any policy that creates opportunities for such discriminatory behavior to be unacceptable*." (emphasis added))).

[67] MISO Report at 2.

[68] Motion to Intervene and Initial Comments of Ameren Services Company and Otter Tail Power Company, Docket No. EL15-68-000, at 2 (filed July 9, 2015).

[69] *Id.* at 2, 10.

38.    Ameren and Otter Tail argue that the Commission erred by grounding its decision in part by finding the initial funding option under Article 11.3 unjust and unreasonable by comparison to Option 2.[70]  First, they state that Option 2 has never been found to be just and reasonable as the only option for meeting the generator's funding obligation. Second, they state that effectively allowing Option 2 funding as the sole option may be unlawful because it fails to compensate a transmission owner for its costs of providing utility service, and instead allows interconnection customers to opt out of paying a return on transmission facilities.[71]  They argue that the Commission may not compel a transmission owner to construct and own transmission facilities without the opportunity to recover its cost of service beyond capital costs.  They state that filling up a transmission owner's plant in service accounts with the sometimes large-scale upgrades funded by others creates a situation where a transmission owner's rate base, upon which it can earn a return and satisfy its investors, is an increasingly smaller part of the transmission system it owns and operates.[72]

39.    Ameren and Otter Tail ask the Commission to terminate the section 206 proceeding established by the June 18 Order and retain the initial funding option in Article 11.3 of MISO's GIA.[73]  Alternatively, they ask the Commission to craft a single, uniformly applicable cost recovery mechanism that balances the interests of transmission owners, generators, load-serving entities, and other transmission customers.[74]  At a minimum, they argue that the Commission should not eliminate a funding mechanism in order to eliminate potential discrimination without developing a record on whether what remains is just and reasonable.[75]  Regardless of what path the Commission takes, Ameren and Otter Tail state that the Commission should make clear that all prudently-incurred transmission costs of service, including the associated O&M costs caused by those

---

[70] *Id.* at 10.

[71] *Id.* at 10-11.

[72] *Id.* at 11.

[73] *Id.* at 2.

[74] *Id.* at 3.

[75] *Id.* at 9.

Docket No. EL15-36-001, *et al.*                                                          - 22 -

facilities, are recoverable in transmission rates if not directly assigned to interconnection customers.[76]

40.    Ameren and Otter Tail also note that the Commission recently issued a notice seeking comment on a petition for rulemaking on generator interconnection issues submitted by AWEA in Docket No. RM15-21.[77]  They argue that the Commission should not compel a prescriptive outcome for the MISO region in this proceeding while simultaneously considering generic interconnection cost issues in a rulemaking proceeding.[78]

41.    The Indicated Transmission Owners submit comments responding generally to the proposition in the June 18 Order that the initial funding mechanism be made optional.[79]  They argue that the Commission should not order a Tariff change as proposed in the section 206 proceeding because there is no actual evidence in the record that vesting the choice of initial funding in the transmission owner leads to undue discrimination.[80]

42.    The Indicated Transmission Owners argue that the proposed tariff change is based on the false premise that allowing a transmission owner to elect to initially fund network upgrades increases costs to interconnection customers.[81]  First, they argue that transmission owners should be able to earn a just and reasonable return on invested capital, and that this should not be considered an increased cost.[82]  Second, they state that the Commission assumes that interconnection customers funding their own upgrades will have free access to capital under Option 2 funding, and that the Commission did not consider that interconnection customers will incur capital costs when they borrow the funds needed to finance the upgrade or pay cash.  They state that the cash option involves

---

[76] *Id.* at 12.

[77] *Id.* at 12.

[78] *Id.* at 13.

[79] Motion for Leave to Answer and Answer of the Indicated Transmission Owners, Docket No. EL15-68-000, *et al.*, at 9 (filed Sept. 2, 2015).

[80] *Id.* at 10.

[81] *Id.*

[82] *Id.* at 11.

20151229-3054 FERC PDF (Unofficial) 12/29/2015

a lost opportunity cost, because the funds used to pay for network upgrades could have otherwise been invested. Third, the Indicated Transmission Owners argue that there is nothing in the record to indicate what costs are associated with financial security or how they compare to financing costs.

43.     The Indicated Transmission Owners state that in no instance under Order No. 2003 was a transmission owner compelled to build network upgrades with no opportunity to earn a return, because under Order No. 2003, all networked facilities are included in transmission rate base, upon which a return is earned.[83] They further state that the Commission's proposed Tariff language would give interconnection customers the ability to require transmission owners to build network transmission facilities on a cash basis with no opportunity to earn a return on investment, which creates an unconstitutional taking in violation of the Fifth Amendment.[84] Specifically, they allege that Option 2 does not allow transmission owners to set a rate of return to compensate for business risk associated with the transmission business, such as lawsuits, reliability compliance obligations, environmental and construction risk.

44.     The Indicated Transmission Owners state that the Commission did not justify reversing *Hoopeston*, where they argue that the Commission found that, when implementing the initial funding option under Article 11.3 of MISO's GIA, the transmission owner is permitted to charge the capital costs of the directly-assigned network upgrades plus a reasonable return of and on invested capital.[85] They state that the Commission is now reversing that holding by finding that the return increases costs without any record to support that decision.[86]

### b.     Interconnection Customer Comments

45.     Alliant states that it supports the Commission's investigation, as the current Tariff does not provide a transparent process for interconnection customer's funding costs to be explored and considered.[87] Alliant supports a balanced approach that takes costs to

---

[83] *Id.* at 12.

[84] *Id.* at 12-13.

[85] *Id.* at 14 (citing *Hoopeston*, 145 FERC ¶ 61,111 at P 41).

[86] *Id.* at 15.

[87] Supportive Comments of Alliant Energy Corporate Services, Inc., Docket No. EL15-68-000, at 3 (filed Sept. 30, 2015).

customers into consideration when determining which party should fund network upgrades.[88]

46.     AWEA states that the Indicated Transmission Owners have not addressed the central reasons why the Commission ordered the section 206 investigation; namely, the opportunities for undue discrimination and increasing costs when there is no increase in service, given MISO's Interconnection Customer Funding Policy.[89]  They argue that the unilateral election of the transmission owner to initially fund network upgrades will result in increased costs to the interconnection customer because the interconnection customer will be required to pay for 100 percent of the network upgrades plus a return on the 100 percent of the cost of capital invested by the transmission owner collected over time, such as a 20 to 30 year period.[90]  They state that this cost is higher than under Option 2 funding, where the interconnection customer must pay either a 90 or 100 percent non-reimbursable cost of the network upgrades.  Thus, they argue that interconnection customers paying under Option 2 will have a cost advantage over similarly situated interconnection customers paying under the initial funding option in Article 11.3 of MISO's *pro forma* GIA, with no attendant increase in service.[91]  AWEA rejects the Indicated Transmission Owners' argument that the premise of increased costs is flawed because, transmission owners argue, when the transmission owner elects to initially fund network upgrades, the interconnection customer is free to invest funds it would have spent on network upgrades elsewhere (i.e. the interconnection customer's opportunity cost of money).[92]  AWEA states that how the interconnection customer chooses to use its funds to undertake its cost of doing business has no bearing under the FPA on whether the rate that a public utility charges is just and reasonable.

47.     AWEA rejects Ameren and Otter Tail's claim that, if the initial funding option is revised as the Commission proposes, Option 2 funding will become the sole means to fund network upgrades, arguing that the transmission owner will still be able to initially

---

[88] *Id.* at 4.

[89] Comments of American Wind Energy Association, Docket No. EL15-68-000, at 3 (filed Sept. 30, 2015) (AWEA Comments).

[90] *Id.* at 4.

[91] *Id.* at 5-8.

[92] *Id.* at 9.

Docket No. EL15-36-001, *et al.*                                          - 25 -

fund network upgrades if the interconnection customer agrees.[93]  AWEA rejects the claim that Option 2 will leave transmission owners with no ability to recover other costs of service, including a return on transmission plant in service.  AWEA states that the Commission in Order No. 2003 already limited the ability of the transmission owner to recover costs such as O&M expenses on facilities up to, but not beyond, the point of interconnection.[94]  In addition, AWEA states that the interconnection customer (or its purchaser of energy) will take transmission service from the transmission owner, and thus pay its fair share of other costs of service, including a return on transmission plant in service.[95]

48.    AWEA rejects claims that the June 18 Order would result in a proliferation of Option 2 funded network upgrades that foist the cost of operating and maintaining the entire transmission system on zone transmission customers.[96]  AWEA states that the initial funding option has been available since 2003, but only two transmission owners within MISO have sought to use it, while all others have used Option 2 funding.[97]  Furthermore, AWEA notes that the cost issue is limited to O&M on network upgrades added in the zone, and not O&M costs for the entire transmission system; but, as it previously noted, AWEA states that Commission precedent does not allow collection of O&M costs for network upgrades directly from interconnection customers.[98]

---

[93] *Id.* at 17; Reply Comments of the American Wind Energy Association, Docket No. EL15-68-000, at 3 (filed July 29, 2015) (AWEA Reply Comments).

[94] AWEA Comments at 12; AWEA Reply Comments at 3.

[95] AWEA Comments at 13; AWEA Reply Comments at 4.

[96] AWEA Comments at 18; AWEA Reply Comments at 4.

[97] AWEA Comments at 17; AWEA Reply Comments at 4-5.

[98] AWEA Comments at 18; AWEA Reply Comments at 4-5 (citing *PJM Interconnection, L.L.C.*, 102 FERC ¶ 61,161 (2003) (the transmission provider could not recover the cost of O&M for network upgrades directly from interconnection customers, but the expense must be collected in transmission rates from transmission customers).  *Duke Energy Corp.*, 95 FERC ¶ 61,279 (2001) (same); *see also Hoopeston,* 145 FERC ¶ 61,111 at PP 41-42 (limiting recovery to a return of and on network upgrades under Option 1 and disallowing recovery of other costs such as O&M)).

49.     AWEA rejects Ameren and Otter Tail's claim that Option 2 funding results in load subsidizing the interconnection customer.[99]  AWEA argues that the subsidization is actually reversed under the current initial funding mechanism – the lack of transmission credits, coupled with MISO's Interconnection Customer Funding Policy of essentially zero reimbursement, provides that the interconnection customer subsidizes the capital cost of network upgrades for which all system users rely on and benefit from.  AWEA states that allowing transmission owners the sole discretion to choose initial funding is unduly discriminatory because it will provide an environment where similarly-situated interconnection customers in MISO pay differently for network upgrades.  AWEA states that, if transmission owners want to retain the discretion to elect initial funding, then either (1) MISO's Interconnection Customer Funding Policy should be revised to provide full credits against the cost of transmission service or a full reimbursement as Order No. 2003 required or (2) the transmission owner should be required to roll the costs of network upgrades into its transmission rate base, which will allow the transmission owner to earn a rate of return as provided in Order No. 2003.[100]  AWEA states that, when MISO adopted its Interconnection Customer Funding Policy, the opportunity to earn a return as contemplated in Order No. 2003 was shifted away from the MISO transmission owners in favor of shifting the entirety of the capital funding costs to interconnection customers.[101]

50.     AWEA states that the June 18 Order is not inconsistent with *Hoopeston*, as the Commission in that case made no finding that paying a return on network upgrade costs does not increase the interconnection customer's cost.[102]  Rather, AWEA states that the record in *Hoopeston* showed an increase in costs as compared to Option 2 funding, but the Commission justified this increase because the transmission owner would be providing the capital investment.[103]  AWEA asserts that this rationale will not be disturbed when the MISO Tariff is revised to allow the transmission owner to provide initial funding for network upgrades only upon mutual agreement by the interconnection customer.

---

[99] AWEA Comments at 18-19; AWEA Reply Comments at 5-6.

[100] AWEA Comments at 11; AWEA Reply Comments at 6-7.

[101] AWEA Comments at 14.

[102] *Id.* at 15.

[103] *Id.* at 15-16.

51.     AWEA does not agree with MISO's statement that it will propose Tariff changes once the Commission addresses pending comments and issues raised by MISO transmission owners – AWEA notes that the Commission has the authority to order MISO to submit Tariff revisions, and AWEA urges the Commission to order MISO to make the Tariff changes as soon as possible.[104]

52.     Hoopeston supports the Commission's finding in the June 18 Order, but asks the Commission to provide guidance on how to apply its order to GIAs that are pending Commission action.[105]  Hoopeston notes that it has a MISO GIA (Hoopeston GIA) that is awaiting Commission action on rehearing in Docket Nos. ER13-2157 *et seq.* and ER14-2754-000, and Hoopeston argues that the Hoopeston GIA is therefore not final.[106] Hoopeston states that the transmission owner under the Hoopeston GIA has unilaterally elected to provide initial funding for the network upgrades under Article 11.3. Hoopeston argues that, since the section 206 investigation in the instant proceeding centers on the justness and reasonableness of Article 11.3, the final order should apply to pending GIAs where the transmission owner has unilaterally elected to provide initial funding under that Tariff provision.  Hoopeston notes that such application should apply to GIAs pending as of the refund effective date set in the instant proceeding, June 24, 2015, such that any funding that has occurred under the GIA up to the refund effective date would not be disturbed.[107]  Hoopeston argues that Commission precedent supports this application of a new ruling going forward to a pending GIA – for instance, in the rehearing of *E.ON*, the Commission stated that its decision to remove Option 1 from MISO's Tariff would not apply to agreements effective prior to the refund effective date set in *E.ON*.[108]

---

[104] *Id.* at 2.

[105] Comments and Motion to Consolidate of Hoopeston Wind, LLC, Docket No. EL15-68-000, at 2 (filed Sept. 30, 2015).

[106] *Id.* at 2-3.  Hoopeston further notes that it has not yet entered into a facilities service agreement for the Hoopeston GIA, which is the document that memorializes the funding policy and binds the interconnection customer to a 20 or 30 year payment plan. *Id.* at 5.

[107] *Id.* at 3-4, 6.

[108] *Id.* at 4-5 (citing *E.ON Rehearing Order*, 142 FERC ¶ 61,048 at P 34).

Docket No. EL15-36-001, *et al.*                                  - 28 -

53.    Hoopeston requests that, should the Commission decline to provide guidance on the issue of pending GIAs, the Commission consolidate the instant proceeding with the pending Hoopeston GIA proceedings in Docket Nos. ER13-2157 *et seq.* and ER14-2754 *et seq.*[109] Hoopeston states that these proceedings have common issues of law and fact because the transmission owner in the Hoopeston proceedings has unilaterally chosen to provide initial funding for network upgrades under Article 11.3 of MISO's *pro forma* GIA, which the Commission found potentially unjust and unreasonable in the instant proceeding.[110] Hoopeston further states that consolidation of these proceedings will result in greater administrative efficiency and avoid the potential for inconsistent results.

54.    Hoopeston requests clarification from the Commission that, if the interconnection customer elects to provide funding for the network upgrades under the FCA or GIA, the customer would not be required to enter into a facilities service agreement.[111]

### c.    Commission Determination

55.    We reject arguments that the Commission's finding in the June 18 Order removes the initial funding option from Article 11.3 of MISO's *pro forma* GIA or effectively limits transmission owners to Option 2 funding as the sole funding option for network upgrades. As the Commission stated, the option to initially fund is available to the transmission owner if the interconnection customer is in agreement.[112] We reject the argument that Option 2 has never been found just and reasonable as the only option for meeting the generator's funding obligation. First, as stated above, Option 2 is not the only option for network upgrade funding. Second, the Commission in *E.ON* explicitly found that Option 2 represents a just and reasonable alternative to Option 1.[113]

56.    We note that, in the June 18 Order, the Commission rejected the argument that removing the transmission owner's unilateral option to initially fund network upgrades would harm an affected system operator through the cost impact of being forced to use Option 2 customer funding, and we affirm that finding here. As the Commission

---

[109] *Id.* at 8.

[110] *Id.* at 11.

[111] *Id.* at 8.

[112] June 18 Order, 151 FERC ¶ 61,220 at P 50.

[113] *E.ON*, 137 FERC ¶ 61,076 at P 40.

stated,[114] this argument implies that the affected system operator is owed the interconnection customer's financing business and need not allow the interconnection customer to choose freely how to fund the costs of network upgrades for which the interconnection customer is responsible.  Furthermore, as between 90 to 100 percent of the costs for network upgrades in MISO are the responsibility of the interconnection customer under MISO's Interconnection Customer Funding Policy,[115] it stands to reason that the interconnection customer would have the incentive to find the lowest cost solution to funding network upgrades associated with its interconnection requests, and therefore the affected system operator should not have control over the interconnection customer's decision of a funding source in order to meet the interconnection customer's obligation.

57.     We reject arguments that removal of the unilateral aspect of the initial funding option improperly imposes costs on transmission owners by depriving them of the ability to recover prudently-incurred transmission costs of service from the interconnection customer beyond capital costs of the network upgrades.  We find that the claim that the initial funding option under Article 11.3 allows transmission owners to recover cost of service beyond capital costs (i.e., non-capital costs) is misplaced given the Commission's prior holding that MISO transmission owners may not recover these non-capital costs from MISO interconnection customers when the transmission owner unilaterally elects to initially fund the network upgrades.[116]  In *Hoopeston*, the Commission found that it would be unduly discriminatory to give a transmission owner the discretion to unreasonably increase an interconnection customer's costs by choosing the initial funding option as opposed to Option 2.[117]  Specifically, the Commission found it unduly discriminatory for a transmission owner to recover costs other than the return of and on the capital costs of the network upgrades from an interconnection customer under the initial funding option in Article 11.3 of MISO's *pro forma* GIA, because an interconnection customer charged under Option 2 would only be required to pay for the capital costs of the network upgrades.  We also reject the argument that, by not allowing transmission owners to recover non-capital costs from interconnection customers, the Commission is compelling a transmission owner to construct and own transmission

---

[114] June 18 Order, 151 FERC ¶ 61,220 at P 50.

[115] The interconnection customer may receive 10 percent reimbursement for the costs of projects that are 345 kV or above.

[116] *Hoopeston*, 145 FERC ¶ 61,111 at P 41.

[117] *Id.*

facilities without the opportunity to recover its cost of service (beyond capital costs). Transmission owners will recover their cost of service (beyond capital costs) through their transmission rates. And the transmission rates will be charged to interconnection customers as the interconnection customers take transmission service on the transmission owner's transmission system.[118]  To the extent that MISO believes that the mutual agreement aspect of the initial funding option raises concerns about the impact of certain costs on particular transmission owners and their customers, MISO may file a proposal under section 205 of the FPA to address such concerns.

58.     We reject the Indicated Transmission Owners' argument that the Commission has assumed the customer has free access to capital if they elect Option 2 and that the Commission has not considered the customer's financing costs or opportunity cost of money. We make no finding that the interconnection customer will not incur its own financing costs under Option 2 funding. The costs that the interconnection customer incurs are irrelevant to our finding that, when the transmission owner unilaterally elects to initially fund network upgrades where the interconnection customer is held responsible for such costs and does not receive credits to reimburse it for those costs, the affected system operator or transmission owner may deprive the interconnection customer of other options to finance the cost of the network upgrades that may provide more favorable terms. The unilateral election of the initial funding option by the transmission owner may deny the interconnection customer the opportunity to use cash to fund its own network upgrades when the interconnection customer's perceived cost of that cash is below the transmission owner's rate charged to the interconnection customer (i.e. the interconnection customer's avoided cost through using cash is above its opportunity cost of cash).

59.     We reject the Indicated Transmission Owners' argument that the Commission's proposed Tariff language would not allow transmission owners to "set" a rate of return to directly assign compensation for business risk, such as lawsuits, reliability compliance obligations, environmental and construction risks, to an interconnection customer, inasmuch as such business risks associated with owning transmission are even included in a transmission owner's return on component under the initial funding option. Our decision does not preclude the transmission owner from *earning* a return on these

---

[118] For instance, both Ameren and Otter Tail are allowed recovery of their transmission related O&M expenses through their associated Attachment O rate formula templates. *See* MISO, FERC Electric Tariff, Attachment O, § 33, OTP Rate Formula Template (32.0.0); MISO, FERC Electric Tariff, Attachment O, § 38, AIC Rate Formula Template (34.0.0).

network upgrades from the interconnection customer where the transmission owner and the interconnection customer mutually agree to the transmission owner initially funding the network upgrade. Moreover, Option 2 is a just and reasonable rate and is available under MISO's Tariff. As such, the Indicated Transmission Owners' argument ignores the continued existence of the transmission owner's initial funding option and as a result misses the fact that any return that was available to a transmission owner when the initial funding election was made on a unilateral basis by the transmission owner is still available when the transmission owner's initial funding option is made on a mutually agreed upon basis. However, inasmuch as the obligation to fund these network upgrades rests with the interconnection customer under MISO's Tariff and as credits are not provided in return for this funding, we find that it is potentially unjust, unreasonable and unduly discriminatory to deprive the interconnection customer of the ability to provide its own capital funding. Furthermore, if there are any other costs that the transmission owner fails to recover for the network upgrades, the same would be true for Option 2, and as stated above to the extent that MISO believes that the mutual agreement aspect of the initial funding option raises concerns about the impact of certain costs on particular transmission owners and their customers, MISO may file a proposal under section 205 of the FPA to address such concerns. We further note that MISO's Tariff requires the interconnection customer to post security in order to address risk during construction.

60.    We reject Ameren and Otter Tail's assertion that the Commission should not compel a prescriptive outcome for the MISO region in this proceeding while simultaneously considering generic interconnection cost issues in a separate rulemaking proceeding in Docket No. RM15-21. The Commission in this proceeding is making a specific finding that MISO's Tariff is unjust, unreasonable, and unduly discriminatory based on the record before us here.

61.    The arguments related to the Commission's alleged departure from Order No. 2003 and *Hoopeston* are addressed on rehearing above. In addition, we reject the Indicated Transmission Owners' argument that there is no record evidence supporting the Commission's decision in the June 18 Order, as we have addressed this argument on rehearing.

62.    We reject Hoopeston's request to apply the ruling in this order to the Hoopeston GIAs that were conditionally accepted in Docket Nos. ER13-2157 and ER14-2754. The Hoopeston GIAs were effective and in existence prior to the June 24, 2015 effective date of the revised Article 11.3 Tariff language ordered below. In recent precedent, "the Commission has declined to modify interconnection agreements that predate revisions to

the relevant Tariff provisions."[119]  This approach is consistent with Commission precedent – for example, in *E.ON*, the Commission removed Option 1 from the Tariff effective March 22, 2011, the refund effective date in that proceeding.[120]  On rehearing, the Commission clarified that the removal of Option 1 would not apply to agreements effective prior to March 22, 2011.[121]

63.     We deny Hoopeston's motion to consolidate the instant proceeding with the Hoopeston GIA proceedings in Docket Nos. ER13-2157 and ER14-2754.  We find no common issues of law and fact.  The Hoopeston proceedings applied the MISO Tariff that was in effect at the time the GIAs were effective, and the instant proceeding amends the MISO Tariff on a prospective basis beginning June 24, 2015.  Moreover, the justness and reasonableness of Article 11.3 was not at issue in the Hoopeston proceedings, and we are not ordering further hearing procedures.

64.     We grant in part Hoopeston's request for clarification.  The purpose of a facilities service agreement is to specify the terms of repayment of money owed to the transmission owner for the network upgrades needed to connect the interconnection customer's facilities when the transmission owner initially funds the network upgrades under MISO's Interconnection Customer Funding Policy.  If the interconnection customer provides the up-front funding for its facilities, there will be no money owed to the transmission owner and thus no need for a facilities service agreement.

65.     As discussed above, we have addressed the concerns stated in the comments on and request for rehearing of the June 18 Order and denied rehearing of that order.  We therefore direct MISO, within 10 days of the date of this order, to propose the Tariff changes, as MISO committed to do in its informational report filing.  Specifically, MISO

---

[119] *See Rail Splitter Wind Farm, LLC v. Ameren Services Company*, 146 FERC ¶ 61,017, at P 21 & n.34 (2014).

[120] *E.ON*, 137 FERC ¶ 61,076 at P 43.

[121] *E.ON Rehearing Order*, 142 FERC ¶ 61,048 at P 34.  *See also Midwest Indep. Transmission Sys. Operator, Inc.*, 143 FERC ¶ 61,050, at PP 68-69 (2013) (allowing Option 1 funding in GIAs that were executed and effective before Option 1 was removed from the Tariff effective March 22, 2011, but rejecting the use of Option 1 funding in amended GIAs that were filed unexecuted and effective after the date of Option 1 removal).

USCA Case #16-1075    Document #1606143         Filed: 03/29/2016      Page 69 of 70

Docket No. EL15-36-001, *et al.*                                    - 33 -

should revise Article 11.3 of its *pro forma* GIA to remove the ability for a transmission owner to unilaterally elect to initially fund network upgrades, as follows:

> Transmission Owner shall provide Transmission Provider and Interconnection Customer with written notice pursuant to Article 15 *that* ~~if~~ Transmission Owner elects to fund the capital for the Network Upgrades and Transmission Owner's System Protection Facilities, *which election shall only be available upon mutual agreement of Interconnection Customer and Transmission Owner*; otherwise, such facilities, if any, shall be solely funded by Interconnection Customer.

In addition, MISO should also include the initial funding language above in its *pro forma* FCA and *pro forma* MPFCA, revising as necessary to reflect the proper terminology for each *pro forma* agreement. We direct that these Tariff changes be made effective prospectively as of June 24, 2015, the date the notice of the initiation of the investigation in Docket No. EL15-68-000 was published in the *Federal Register*.

The Commission orders:

(A)    The request for rehearing of the June 18 Order is hereby denied, as discussed in the body of this order.

(B)    Hoopeston's motion for consolidation is hereby denied, as discussed in the body of this order. Hoopeston's request for clarification is hereby granted in part, as discussed in the body of this order.

(C)    MISO is hereby directed to submit a compliance filing to revise its Tariff, within 10 days of the date of this order, to be effective on a prospective basis as of June 24, 2015, as discussed in the body of this order.

By the Commission.

( S E A L )

Nathaniel J. Davis, Sr.,
Deputy Secretary.

USCA Case #16-1075     Document #1606143          Filed: 03/29/2016     Page 70 of 70
Document Content(s)

EL15-36-001.DOCX...................................................1-33